MINNESOTA PUBLIC INTEREST RE-
SEARCH GROUP, et al., Respondents,

v.

WHITE BEAR ROD AND GUN
CLUB, Appellant.

No. 46951.

Supreme Court of Minnesota.

July 22, 1977.

Newcome, Wallace & Newcome and Jack C. Wallace, St. Paul, for appellant.

Edward A. Zimmerman, Edina, Will H. Hartfeldt, St. Paul, for respondents.

Kristen C. Nelson, Minneapolis, for Sierra Club, seeking affirmance, amicus curiae.

Heard before KELLY, TODD and Mac-LAUGHLIN, JJ., and considered and decided by the court en banc.

MacLAUGHLIN, Justice.

This is an action for declaratory and injunctive relief pursuant to the Minnesota Environmental Rights Act, Minn.St. c. 116B. The trial court granted declaratory judgment stating that defendant's activities in constructing and operating a trap-and-skeet-shooting facility on the southerly border of Rice Lake near Hugo in Washington County constitute pollution, materially affect the environment adversely, and constitute impairment or destruction of the environment. The trial court permanently enjoined the operation of defendant's facility at that location, and defendant has appealed from the resulting judgment. Because we believe the evidence supports the conclusion of the trial court, we affirm.

Defendant, White Bear Rod and Gun Club (hereafter referred to as Gun Club), is a nonprofit corporation which had operated a trap-and-skeet-shooting facility in the White Bear Lake area since the 1930's. When its property was substantially condemned for highway construction, the Gun Club was forced to seek a new location. In 1971 the Gun Club obtained an option on 80 acres of land located about 1300 feet from the southern border of Rice Lake. Rice Lake is about 1½ miles east of the city of Hugo, Minnesota, in an area generally considered to be part of the St. Paul-Minneapolis metropolitan area.

Rice Lake is a shallow body of water covering approximately 115 to 130 acres, located in a natural bowl, and surrounded by hilly areas. There are no public roads nearby and little exposure to outside noise or disturbance. The lake has an abundance of disintegrated vegetation and is fed by springs and ditches which flow from the higher ground. It is surrounded by peat marshes and brush swamp on which grow

substantial quantities of aspen, alder, tamarack, red dogwood, and elm.

Because of substantial surrounding areas which are covered with water during the spring of the year, Rice Lake provides cover, shelter, and food for migratory waterfowl and serves as a habitat for other birds as well. Deer, muskrat, fox, porcupines, raccoons, badgers, and other animals abound in the woods and wetlands surrounding the lake.[1]

The land in the immediate vicinity of Rice Lake is zoned farm-residential and nearby owners use their property for farming, hunting, recreational, and residential purposes. Paul Hugo Farms, Inc., has owned 320 acres of adjacent land since the 1940's, including much of the shoreline of Rice Lake, and has attempted to preserve and maintain the property in its natural state. The owners planted wild rice to attract migratory waterfowl and have attempted to sell the entire property to the state to assure the perpetuation of the wildlife and wetland area.

In 1972, the Gun Club applied to the Hugo City Council for permission to use the optioned property as a trap-and-skeet-shooting facility. The request was denied and the Gun Club was advised to apply for a special use permit since it wished to construct buildings on the site. The Gun Club then completed the purchase of the optioned 80 acres and in late 1972 applied to the Hugo Planning Commission for a special use permit. It should be noted that at the time of the purchase of the land no permits of any kind had been granted to the Gun Club.

Meanwhile, in 1972, a citizens group had been organized to oppose the construction and operation of the Gun Club and petitions were circulated among the property owners in the surrounding area. With few exceptions, all of those who lived within a 1-mile radius of Rice Lake, at least 75 persons, signed the petitions in an effort to prevent the Gun Club's construction of a trap-and-skeet-shooting facility at the proposed location.

In October 1973, after several alterations and modifications of its plans, the Gun Club again applied to the Hugo City Council for a special use permit. Subsequently, on February 27, 1974, the Hugo Planning Commission recommended approval of a special use permit which incorporated certain conditions which had been recommended, in turn, by the Washington County planning coordinator.

On May 6, 1974, the Hugo City Council held an open meeting on the question of the Gun Club's application for the special use permit. The hearing was attended by a large crowd of Hugo residents and other interested parties. On that date, under substantial protest, the city council granted the issuance of the permit but with 26 conditions incorporated therein.

While not directly pertinent to our resolution of this action, one of the conditions mandated that certain trees be planted by June 1, 1975. That condition also stated that if it was not met by the date specified the "Special Use Permit shall become null and void in its entirety."[2] Another condition limited noise emission from the Gun Club's property to 40 decibels (dba). The evidence clearly shows that at no time since the Gun Club began operation has the decibel limit been within the 40-dba limitation

---

1.  Rice Lake was described by one of plaintiffs' expert witnesses, Dr. Miron Heinselman, professor of ecology and behavioral biology at the University of Minnesota, as "a lake with still quite natural marshland fringe" and as "one of the finest undeveloped waterfowl lakes in the Twin Cities area."

2.  During the summer of 1975, the Hugo Planning Commission became aware that certain conditions of the Gun Club's special use permit had not been complied with. In particular, the Gun Club had not planted trees as required by

the permit before the specified date. Therefore, on September 18, 1975, the Hugo city attorney wrote an opinion to the mayor and the Hugo City Council in which he stated that in the absence of any request for variance by the Gun Club, as provided for in the permit, "the Special Use Permit became null and void as of June 1, 1975." He also was of the opinion that "actions by the City Council after June 1, 1975, would have no legal effect to re-instate the Special Use Permit."

of the permit. Further, Alfonso Perez, a noise pollution expert, testified that he informed the Gun Club applicants at the time of the hearing before the Hugo City Council that there was no possibility that they could comply with the decibel limitation contained in the permit.

Subsequent to the issuance of the special use permit, over 500 citizens of the Hugo-Rice Lake area petitioned the Environmental Quality Council pursuant to the provisions of Minn.St. 116D.04, subd. 3, requesting the appointment of a task force for an environmental assessment of the effects of the Gun Club on the surrounding area. The environmental assessment was completed by October 1974, and stated, in part, as follows:

"The proposed project has the potential for significant environmental effects in two areas. First, the noise from the facility will undoubtedly violate the conditions of the special use permit, and it has the potential of affecting the value of land in the area for residential develop-

ment. Secondly, the spent shot which would fall into the lowland on the northern half of the property will undoubtedly contribute dissolved lead to the surface water, in concentrations exceeding the levels recommended by the Environmental Protection Agency." [3]

On November 29, 1974, *before construction had begun*, plaintiffs, Minnesota Public Interest Research Group (M.P.I.R.G.) [4] and Hugo Electors Leading Progress (H.E.L.P.), [5] brought an action in Washington County District Court seeking declaratory and injunctive relief to prohibit the Gun Club from further activities in the construction or operation of its proposed trap-and-skeet-shooting facility. Plaintiffs alleged adverse effects detrimental to the environment and injurious to the natural resources of the state in violation of Minn.St. c. 116B, specifically that noise from the Gun Club operation would substantially disturb and degrade the quietude of the area, and that lead shot from the skeet and trap lines would fall over a sub-

**3.** No environmental impact statement was prepared because, as the environmental assessment stated: "Ordinarily, based on the conclusions of this assessment, the preparation of an Environmental Impact Statement would be recommended for the proposed project.

"However, MEQC 26(C)(6) states that: '(C) an EIS shall not be required in the following instances: (6) When a new action meets one of the following: (aa) the last governmental permit has been issued by a public agency on the private action.' The special use permit for the construction of the proposed facility was issued on May 6, 1974 [by the Hugo City Council]. Since there are no further permits required for the project, it appears that the EQC cannot require the preparation of an Environmental Impact Statement."

It is also interesting to note that the October 1974 environmental assessment contained the following observations:

"The results of this study have pointed out a number of environmental factors which should be considered in choosing a site for a trap and skeet shooting range.

"First, a site where the ground had previously been disturbed by farming or other human activity would for the most part preclude the problem of removal of natural vegetation and wildlife habitat destruction.

"The site should provide protection to neighboring areas from the effects of noise by providing either a large buffer zone on-site or by

the existence of a physical barrier. Such a physical barrier could be natural hills or manmade changes in topography. A good location for a shooting range might be in a large unused gravel pit. Shot recovery would be relatively easy and sound from shooting would be deflected upward by the banks surrounding the area.

"The site should also be chosen so there will not be extensive run-off drainage from the shot impact area into lakes and streams.

"These considerations in the selection of a shooting range on a gun club site could avoid many or all of the problems encountered by the White Bear Rod and Gun Club at the Hugo site."

**4.** M.P.I.R.G. is a nonprofit corporation, whose members reside within Minnesota. Its financial support is principally derived from some 60,000 students in Minnesota universities and colleges and from the Minnesota Public Research Foundation. Issues brought before its student-controlled and student-elected board of directors may be adopted and legal counsel employed.

**5.** H.E.L.P. is an organization of residents of Hugo, Minnesota, whose initial purpose was to unite to preserve the environment around Rice Lake. Its goals also include other matters of public concern.

stantial area of the wetlands near the lake and have a toxic effect on waterfowl and wildlife which feed and nest in the area.

On December 12, 1974, plaintiffs sought a temporary injunction enjoining the Gun Club from further activity at the site, but this relief was denied by District Judge John F. Thoreen, who noted in his order of January 15, 1975:

"* * * The defendant is fully aware (and it is a matter of record) that it must bear the risk of being limited or totally enjoined in its use of this land as a gun club."

Construction then proceeded and ultimately the Gun Club built the largest facility in the state of Minnesota with 16 different shooting stations, and a club house with a shooting range in the basement. The special use permit allows shooting 365 days of the year and provides that shooting hours shall be from 10:00 a. m. to 6:00 p. m. on Sundays and holidays and from 10:00 a. m. to 9:00 p. m. on weekdays. There was considerable evidence that heavy shooting takes place at the Gun Club. The evidence also established that several persons may be firing guns from any one shooting station. Jerome Perron, president of the Gun Club, testified:

"Q Why aren't they spreading out and using all sixteen [stations]? * * *

"A Well, normally when a group of people shoot or squat, as it's called, you have five people. And in the workings of the club, just for purposes of expediting things, you try to get a full squad of five people to go out and shoot at one time on one facility."

Dr. James Cooper, an expert witness for plaintiffs, who made visits to the Gun Club area also confirmed this practice in the following testimony:

"Q Did you witness shooting at the gun club?

"A Yes, I did.

"Q Would you describe how that shooting was taking place?

"A Well, the shooting was trapshooting at the time. I think most of the time they were shooting doubles since it was rapid two-fired shooting almost all the time and the shooting was taking place to the north over the wetland.

"Q How many facilities were they using when you saw them?

"A Just one.

"Q How many people were shooting?

"A I didn't make a count. I believe between four and six."

The trial in this action began on March 23, 1976, before Judge Leslie L. Anderson, and lasted for 7 days. There was extensive testimony by lay and expert witnesses and numerous documents, reports, and correspondence were placed in evidence. On April 19, 1976, the trial court made findings of fact and conclusions of law, and ordered entry of declaratory judgment and permanent injunctive relief in favor of plaintiffs. Specifically, the trial court found that defendant's activities constituted pollution, destruction, and impairment of the environment. A stay of the injunction was granted during the pendency of this appeal.

Defendant's motion for amended findings of fact and conclusions of law or a new trial was denied, and on June 25, 1976, plaintiffs moved the trial court for an order enforcing the injunction during the pendency of this appeal since shooting at the Gun Club had continued unabated. Additional testimony was taken and the permanent injunction was restored by order of the trial court on July 1, 1976. The Gun Club appealed to this court for a stay pending our decision in this case, but the stay was denied.

1. By its adoption of the Minnesota Environmental Rights Act in 1971, the legislature created for the citizens of this state the "right to the protection, preservation, and enhancement of air, water, land, and other natural resources" located within Minnesota. Minn.St. 116B.01. The legislative policy is intended to—

"* * * create and maintain within the state conditions under which man and nature can exist in productive harmony in order that present and future generations

may enjoy clean air and water, productive land, and other natural resources with which this state has been endowed." Minn.St. 116B.01.

Minn.St. 116B.03, subd. 1, provides the right to maintain an action in the district court for declaratory or equitable relief by—

> "*[a]ny person residing within the state*; the attorney general; any political subdivision of the state; any instrumentality or agency of the state or of a political subdivision thereof; *or any partnership, corporation, association, organization, or other entity having shareholders, members, partners or employees residing within the state * * *.*" (Emphasis supplied.)

■ It was clearly the legislature's intent to create an adequate civil remedy to protect natural resources. "Natural resources" is broadly defined in Minn.St. 116B.02, subd. 4, to include "all mineral, animal, botanical, air, water, land, timber, soil, *quietude*, recreational and historical resources." (Emphasis supplied.) Minn.St. 116B.02, subd. 5, describes "pollution, impairment or destruction," as—

> "* * * any conduct by any person which violates, or is likely to violate, any environmental quality standard, limitation, regulation, rule, order, license, stipulation agreement, or permit of the state or any instrumentality, agency, or political subdivision thereof which was issued prior to the date the alleged violation occurred or is likely to occur *or any conduct which materially adversely affects or is likely to materially adversely affect the environment * * *.*" (Emphasis supplied.)

■ Thus, it is clear that Minn.St. 116B.02, subd. 5, allows a complaining party to establish pollution, impairment, or destruction of the environment through two possible means: (1) By proof that the conduct in question violates, or may violate, any environmental quality standard, rule, or regulation of the state or any political subdivision thereof; or (2) by proof that the conduct complained of "materially, ad-

versely affects or is likely to * * * affect" the environment.

Plaintiffs in this action did not attempt to show violations of rules or standards but relied upon their right, under the statute, to show that the conduct of the Gun Club materially adversely affected the environment. Plaintiffs alleged that noise pollution by the Gun Club caused and would continue to cause loss of quietude ("quietude" is defined as a "natural resource" in Minn.St. 116B.02, subd. 4), and that the loss of quietude would harm both wildlife and persons within the surrounding area. Plaintiffs also alleged that lead shot deposits in the wetlands caused and would cause destruction of wildlife and waterfowl by ingestion of lead shot, and that removal of the marsh area would cause destruction of animal and plant life on adjacent land.

In any action which does *not* concern conduct governed by an environmental quality standard, rule, order, or permit issued by the Pollution Control Agency, the Department of Natural Resources, or the Departments of Health or Agriculture, Minn.St. 116B.04, provides in part:

> "* * * *[W]henever the plaintiff shall have made a prima facie showing that the conduct of the defendant has, or is likely to cause the pollution, impairment, or destruction of the air, water, land or other natural resources located within the state, the defendant may rebut the prima facie showing by the submission of evidence to the contrary. The defendant may also show, by way of an affirmative defense, that there is no feasible and prudent alternative and the conduct at issue is consistent with and reasonably required for promotion of the public health, safety, and welfare* in light of the state's paramount concern for the protection of its air, water, land and other natural resources from pollution, impairment, or destruction. *Economic considerations alone shall not constitute a defense hereunder.*" (Emphasis supplied.)

We recently interpreted Minn.St. 116B.04 as it applies to the burden of proof in

*County of Freeborn v. Bryson,* 297 Minn. 218, 210 N.W.2d 290 (1973). In that case the plaintiffs brought an action alleging that the proposed condemnation of their land for a county highway would materially adversely affect portions of a natural wildlife marsh. Both the attorney general and the Sierra Club were granted permission to intervene, but the trial court dismissed the action finding that the plaintiffs had failed to establish a prima facie case as required by Minn.St. 116B.04.

On appeal we held that the evidence presented by the landowners had established a prima facie showing that construction of the highway would materially adversely affect the environment and that, on remand, the county would have to rebut this evidence. We ruled that such a prima facie showing requires proof not only of a protectable natural resource as defined in Minn.St. 116B.02, subd. 4, but also that the conduct complained of constitutes pollution, impairment, or destruction of that natural resource. Minn.St. 116B.02, subd. 5.

In the *Bryson* case we observed that the plaintiffs' expert witnesses had testified that the marshes, wetlands, and open-water ponds in question provided a unique natural environment because they were capable of supporting a greater diversity of life than other habitats, and that, because of its natural attributes, it was a desirable waterfowl habitat and production area. We held that the plaintiffs' evidence was sufficient to establish a protectable natural resource as well as pollution, impairment, or destruction of that resource and remanded the case to give the county an opportunity for rebuttal.

On remand, the trial court refused to enjoin the highway construction and the plaintiffs again appealed. We then reversed and remanded in *County of Freeborn v. Bryson,* Minn., 243 N.W.2d 316 (1976), stating that in the absence of unusual or extraordinary factors, the Minnesota Environmental Rights Act requires that a trial court enjoin environmentally destructive conduct if a feasible and prudent alternative is shown.

Recognizing the state's paramount concern for the protection of natural resources we observed:

" * * * Whether for highways or for numerous other reasons, including agriculture, it is a well-known fact that marshes have been drained almost indiscriminately over the past 50 years, greatly reducing their numbers. The remaining resources will not be destroyed so indiscriminately because the law has been drastically changed by the Act. Since the legislature has determined that this change is necessary, it is the duty of the courts to support the legislative goal of protecting our environmental resources.

"In addition, we think the record adequately establishes that this particular marshland does have unique characteristics that the Act was intended to protect. An ecological unit in itself, it is also part of a larger drainage area several miles long, consisting of marshes, streams, and potholes, extending from the Peterson and Bryson farms north to Freeborn Lake. The marsh involved here contains waterfowl and upland game birds, both of which have greatly decreased in numbers in Minnesota during the past 10 or 15 years. In the same period, marshlands and other natural habitats have been greatly reduced." Minn., 243 N.W.2d 321.

Since there was a feasible and prudent alternative route available for the highway, we held that the county had failed to rebut the plaintiffs' prima facie showing and that injunctive relief was appropriate under the circumstances.

In the case at hand, abundant evidence was produced during the 7-day trial to establish that Rice Lake and its surrounding wetlands constitute a "natural resource" within the meaning of the statute. The area abounds in animal and botanical life, as well as water, land, timber, soil, and quietude. Owners of adjacent property testified that the area contains numerous animals and birds including foxes, squirrels, raccoons, deer, partridge, pheasant, woodcocks, and ducks. There are elm, birch,

poplar, aspen, and other trees in abundance. Howard Schletty, who has lived on property next to the Gun Club for 28 years, testified regarding waterfowl as follows:

"Q   Okay.   Have you ever seen any— Can you tell us what kind of waterfowl you see down in that area?

"A   Sure, ducks, geese, loon.

"Q   Can you tell us where you have seen them specifically with relationship to the gun club property?

"A   On it, over it, landing on it, getting up from there.   *   *   *

"Q   Do they feed on your duck pond?

"A   They feed in the area.

"Q   Are there any other places where they feed?

"A   Not close in that I know of.   Generally they fly away over and back, but they, the ducks do feed in the swamp area, that I know.

"Q   Would that include the swamp area on the gun club area or not?

"A   Would be, yes."

Robert Waller, who lives immediately adjacent to the Gun Club property, testified:

"Q   Now, in the area on your property in this marsh where the water accumulates when it accumulates, what kinds of waterfowl do you find down there?

"A   It depends on the time of the year.

"THE COURT: Well, any time of the year, what kind?

"A   Ducks, well, just all the birdlife of the State of Minnesota.   *   *   *

*   *   *   *   *   *

"Q   *   *   *   When that land is flooded and the ducks are down in there, what are their feeding habits then?

"A   Mallards will be feeding on the potholes or what I would call potholes and so forth."

Dr. Miron Heinselman, a forest ecologist and professor in the Department of Ecology and Behavioral Biology at the University of Minnesota, described the area as follows:

"   *   *   *   I think it's an exceptionally fine example of a waterfowl lake, a lake with still quite natural marshland fringe

and somewhat injured forested wetland around the periphery.   It's one of the finest undeveloped waterfowl lakes in the Twin Cities area that I'm aware of.   It's an exceptionally fine waterfowl lake."

*   *   *   *   *   *

"   *   *   *   Well, Rice Lake is quite remote at the moment from any freeways, the immediate developed urban area, and there is still a relatively little development around it with exception of the gun club.   So that, when one is down on the lake looking at the lake, it's surrounded by higher land, all one sees really is this wild and rather natural lake.   *It's a very, in terms of the Twin Cities environment, it's a very lovely quiet place, assuming, you know, that there isn't the disturbance of the gun club interrupting the situation.*"   (Emphasis supplied.)

Based upon this and other testimony, the trial court correctly found that:

"   *   *   *   Rice Lake itself retains its natural character, and the area is one of the few of its sort within the seven-county metropolitan area.   Because of these distinct and significant characteristics, the Rice Lake wetland area is deserving of special protection to assure its environmental qualities for the present and for future generations in Minnesota."

Once they had established these protectable natural resources, plaintiffs were required to show their pollution, impairment, or destruction by reason of defendant's conduct.

Plaintiffs alleged both noise pollution which impaired the quietude of the environment (it is important to remember that "quietude" was established by the legislature as a protectable natural resource under Minn.St. 116B.02, subd. 4) and pollution and destruction of water and wildlife as a result of the heavy deposits of lead shot which have been, and will be, deposited onto the wetland areas through the activities of the Gun Club.

■   There was a great deal of evidence concerning excessive noise in the area caused by the Gun Club.   Alfonso Perez, chief of the Noise Pollution Control Section

of the Minnesota Pollution Control Agency, testified on behalf of plaintiffs. He stated that the sharp, impulsive sounds of gunfire can be a health threat when heard repeatedly. Specifically, such sounds can cause general irritability, loss of sleep, and hearing damage. Perez observed that although Minnesota has not yet developed standards for impulsive sounds [6] his tests near the Gun Club property indicated decibel levels ranging up to 70 dba, far in excess of that considered permissible to avoid health threats and degradation of the environment.

The test conducted by Perez at locations near the Gun Club involved 16 shooters representing the 16 stations of the Gun Club.[7] The shooters were instructed to fire one box of regular, trap-load shotgun shells, firing one shot together and the rest at random intervals in groups of five. Perez obtained readings of 65 to 70 decibels at a point even with the line of shooters but 335 yards to the west of the shooters, a distance within which several residents of the area live with respect to the Gun Club area.

Decibel levels, particularly as they relate to the background level of sound in a given area, are important in measuring the volume and intensity of sound in the area. Perez testified that ordinarily the background noise level in a rural area such as that of Rice Lake would be between 30 and 40 dba's. He was asked if he had taken readings on the background noise at Rice Lake and responded:

"A Yes, we observed the background levels and, not surprisingly, they were in the 30's.

*       *       *       *       *       *

"Q You said that the background reading was in the 30's. You've said that the readings that you got at the test at the one location parallel to

the line of fire were between 65 and 70.

"A That's correct.

"Q Would you compare these two for us? What does that mean?

"A That means that the level[s] that we were measuring were exclusive [of] the guns or the shots. And that the background being in the 30's and the shots being in the 60's, it's clearly, a 65 to 70 reading was clearly due to the guns. There was no background influence on those shots."

Perez then explained the significance of increased levels of decibels:

"Q Okay. So if the background is 30 and the guns make a noise level of 65 to 70, is there a way of comparing those two in terms of the way the ear hears them?

"A Normally, the human ear would express a 10-decibel increase as a doubling of the loudness of the sound. So if, for example, you hear a sound at 30, a sound of 40 will sound twice as loud as that at 30. A sound of 50 would sound four times as loud. A sound of 60 would sound eight times as loud, and so on, and so on, every ten decibels a doubling of the loudness of the sound. * * *

"Q How would a sound of 70 decibels compare with a sound of 30?

"A Well, that's 40 decibels, so that would be sixteen times louder.

"Q Than the background?

"A Yes."

Dr. Stephen Chapman, an expert called by plaintiffs, who resides in the area of the Gun Club, also confirmed the low noise background in the Rice Lake area in the following exchange:

---

**6.** The fact that the Pollution Control Agency has not developed standards for impulsive sounds in no way prevents interested persons from instituting an action under the Environmental Rights Act for impairment of quietude, a protected resource under that act. As established in this opinion, the act has created a right in each person to bring an action for the

protection of the environment whether or not there are standards or regulations issued by a governmental body concerning the alleged violations. See, Minn.St. 116B.02, subd. 5.

**7.** As stated previously, it should be borne in mind that oftentimes several shooters will shoot from a single station at the Gun Club.

"A  Well, having measured with Mr. Perez the levels last summer and knowing what the levels are in the neighborhood in the quietude of Hugo in this area, including my own home and what not, the levels which should be achievable for nondegradation of sound or from the levels of the neighborhood should be roughly 35 decibels.

"Q  That's for nondegradation?

"A  For nondegradation. These are the measurements that we took.

"Q  Would 40 decibels then be close to the nondegradation standard?

"A  40 decibels would be close to the nondegradation standard, if attainable.

"Q  That would be close to the background noise in the area?

"A  Close to the background. 35 decibels, I measured along with Mr. Perez who brought the instruments up from the State. We measured the background of this area and it's roughly 35 decibels to 32 decibels. This gets down very, very quiet. It's a very quiet neighborhood. In fact, the swish of grass with a little bit of a breeze is essentially 32 decibels on the dba scale.

"Q  If you were going to put a gun club into that environment and ask them to do as little noise damage as possible, what do you think they could do with the best sound control technology that you know?

"A  I think it would be impossible."

Evidence was introduced at the trial of another noise test taken on November 29, 1973, at the request of the Gun Club, by International Acoustical Testing Laboratories, Inc. The noise source for that test was a Winchester Model 12-gauge shotgun with standard trap load. The test showed a 75-dba noise level at the eastern perimeter of the Gun Club property and a 63-dba noise level at the western perimeter. The report sent to the Gun Club describing the test indicates that the reason for the lower reading on the western perimeter of the Gun Club was that the wind was blowing out of the southwest thereby lessening the noise level on the west line of the Gun Club property.

Peter Schuna, a member of Paul Hugo Farms, Inc., testified as to background noise in the area as follows:

"Q  So [Rice Lake and environs] is down in a bowl in essence?

"A  Yes, pretty much of a bowl.

"Q  When you're down there in that lake, what can you hear from the outside world?

"A  Well, not a whole lot other than airplanes going over."

Even though the Gun Club had not been fully operational during the spring and summer season prior to the time of the trial in this action, there was considerable evidence from neighbors as to the disturbance of noise from the Gun Club.

Howard Schletty, who lives on property adjacent to the Gun Club, on which parts of Perez' test was conducted, and who was present when Perez conducted the test, testified as follows:

"Q  Where were you when [the Perez] test took place?

"A  I was with Mr. Perez part of the time.

"Q  Okay.

"A  On our property and my mother['s] and my dad's.

"Q  Were you with him when he made the measurements?

"A  I believe, yes I was at one or two points.

"Q  Do you have a recollection of what the sound was like, of the shooting that you were hearing?

*     *     *     *     *     *

"A  Right.

"Q  Would you compare that sound that you heard then to the sound that you are hearing [now] from the gun club?

"A  * * * Yes, I would say the sound we are hearing now is sharper than that we heard that day. * * *

"Q  *Okay. Then you are saying that the sound that you are hearing now is normally sharper than the sound that you heard that day at the time you were with Mr. Perez making measurements?*

"A  *That's right.*"

Clara Miron, who lives on a farm with her husband at the north end of Rice Lake, about 1½ miles from the Gun Club, testified as follows:

"Q  Would you tell us what you heard Sunday afternoon, March 28, during the day on Sunday? [The trial in the instant matter began on March 23, 1976, and the witness was testifying as to noise from the Gun Club the Sunday just prior to her testimony].

"A  From about 10:30 in the morning until 6:30 in the evening, it was continuous shooting. And this was in the house with the storms and doors closed.

\*  \*  \*  \*  \*  \*

"Q  You heard the shooting while you were in the house?

"A  Yes.

"Q  How loud was it in your estimation?

"A  Well, if my children were shooting right in our own back yard, it was about the same loudness.

\*  \*  \*  \*  \*  \*

"Q  What was the frequency of the shooting?

"A  One after another for quite some time and then there was a lull and then again.

"Q  Did you ever time them?

"A  No, I didn't.

"Q  Thank you. How did you personally react to this shooting?

"A  Well, it is very disturbing when you're trying to rest or, like I just sat down for a few minutes to rest. I was having a large group over and I sat down and that's all you hear."

Stephen Chapman, also a nearby resident, testified as follows as to what he heard from the Gun Club:

"Q  Okay. What was the pattern of shooting? Was there a discernable pattern to it?

"A  No, it was almost consistent all the time. Coming in rapid sequence, like, and stopped for a second or so and again. It goes tuk-tuk-tuk-tuk."

Another nearby resident, Robert Waller, after describing the sounds from the Gun Club, testified as follows:

"Q  Okay. When you hear these sounds, do they have any effect on you?

"A  Aside from the irritation that has developed, etc., I would not feel happy walking in my woods listening to this as a constant barrage. I would not want to sit down in my woods and observe as I did this winter. To do something of that nature, you have to sit and watch and I would not be comfortable with that type of staccato, intermittent shooting that is occurring at this time. Personally, I would have to get up and go back to the house."

James Smith, another resident in the area, was asked:

"Q  \*  \*  \*  Now, the shots that you can hear, how do you react to those personally?

"A  Well, they're very irritating. And I think as time goes on, I guess, that, you know, I would react more negatively to the shooting."

Still another area resident, William Hanson, testified:

"Q  Okay. How do you react to the noises you're hearing?

"A  I am somewhat irritated by the noise. I moved out into the area to enjoy country living and quietness and I don't like this constant snappy noise. \*  \*  \*

"Q  Does it, in your view, diminish your enjoyment of your property?

"A  Definitely."

Dr. Miron Heinselman, an expert witness for plaintiffs, who had made visits to the

area, testified concerning noise created by the Gun Club:

"* * * Obviously heavy shooting, such as I experienced yesterday, would be very disagreeable. I would not care to live there myself. I would testify to that instantly. That kind of thing troubles me. I just don't like to live in a noisy environment like that."

Dr. James Cooper, professor of wildlife ecology at the University of Minnesota, testified that the sound of shooting is disturbing to waterfowl as well as human beings. Although noise from the Gun Club might not have a significant effect on local ducks which could become accustomed to the sound, he thought it would seriously affect migratory birds.

Defendant attempted to establish that noise from the Gun Club should not be considered a problem because there are three game-farm-and-hunting preserves within a few miles of Rice Lake. The defendant particularly singled out Paul Hugo Farms, Inc., which owns 320 acres of land on Rice Lake and is a duck-hunting club. There was a great deal of evidence regarding Paul Hugo Farms and the trial court found that the membership of Paul Hugo Farms—

"* * * 13 persons in all, desired to have a quiet place to go to, to keep the property around the lake in a practically virgin or wild state, to shoot ducks there in season, and to do some amount of clay pigeon shooting * * *. On the opening day of a duck season, there will be from 16 to 20 duck hunters there, although that number dwindles after the opening day. * * * The Farms is attempting to assure the perpetuation of the wildlife and wetland area, and has made overtures to the proper State agency for sale to the state."

The trial court further found that the—

"* * * Noise from the Hugo farms typically goes on for only about three days, and its shooting rarely * * * is bothersome to neighbors. That shooting is distinguished from that at the defendant Club in that it is not continuous and

occurs only as to a duck in flight. That from the defendant Club is allowable every day for long hours. It can be heard in some of the homes when windows are closed. The sounds are irritating to residents in the vicinity and are generally disturbing. * * * There is no reasonable comparison between the limited duck shooting in the vicinity and the steady volume of shooting at the defendant Club."

There is an abundance of evidence to support the trial court's conclusion regarding Paul Hugo Farms. For example, Peter Schuna, one of the founders of Paul Hugo Farms, testified as follows:

"Q  Would you tell me about that organization?

"A  Well, it was a group of people that, through association, just by word of mouth, seemed to have the same basic ideas. There was a piece of wilderness available that was close to the city. We all more or less had the same philosophy in that we wanted a piece of the world to call our own. It was somewhat of a virgin wilderness and it had a lot of things that we felt we wanted out of life in respect to the quiet place to go to. It afforded duck hunting, it afforded us a chance to keep something in its initial state, or at least in the state we got it in, and we attempted to do that through all the years we have been there. We haven't built any structures there, and as far as our means and our ability provided, we have attempted to keep things natural and wild. That's about what it amounts to.

* * * * * *

"Q  Now, how many members are in your organization?

"A  There are 13 members.

"Q  How long during the fall do you hunt the lake?

"A  Well, right now I would have to qualify what I say in that about half of our membership doesn't hunt any-

more, so I would say that the first three weekends of the duck season would be when the majority of the people would be out. After that it would pretty well taper off.

"Q During that period of time—the first three weeks of the duck hunting season—how intensively do you hunt the lake? How many people are out there and how many days?

"A The most I would say would be 15 or 20 people on opening day. After that it would dwindle to, say, 8 or 10. That would be about it."

One of the long-time members of Paul Hugo Farms, who serves as its president, testified:

"Q * * * Have you ever received any complaints in the years that you've been firing on the Paul Hugo Farms regarding the noise from your shooting?

"A No, we have never had any complaints and we have never been considered a nuisance because of the firing that took place at any time, in all of the time we have had it, that I can remember from anybody."

Various other witnesses distinguished between the noises from the Gun Club and the shooting at Paul Hugo Farms. For example, William Hanson, who lives in the vicinity, testified as follows:

"Q Have you in the past had occasion to hear the shooting that apparently takes place at the Paul Hugo Farms during the hunting season?

"A I couldn't swear to where the shots are coming from, but there are shots at a certain time of the year that come from the north.

"Q What time of the year is that?

"A In the fall. I really couldn't tell you the date.

*     *     *     *     *     *

"Q Okay. Could you describe that sound that you heard from the north in the fall?

"A It would be basically the same except that it's very, very few shots.

There would be very few times you'd hear the noise or very spread out."

Resident Robert Waller testified as follows:

"Q Okay. You've lived there a number of years. Have you heard the shooting that comes from the Paul Hugo Farms during that time?

"A Yes, and gotten to the point on opening day, we'll go out to observe the shooting, stand on the hills and observe the local ducks getting up in the area and the barrage that starts just before the noon hour opening and continues for ten or fifteen minutes after that. And then there is just intermittent sporadic shooting throughout the day.

*     *     *     *     *     *

"Q Could you compare it to the shooting that you are now hearing from the gun club?

"A I would make this comparison. * * [The Gun Club shooting] continues from 10:00 in the morning until 5:00 at night or thereabouts. * * * There is no degree of consistency before duck shooting * * *.

*     *     *     *     *     *

[The duck shooting] initial firing and opening day is kind of a thing like going out and watching the fireworks on the hills on the Fourth of July. This is kind of a thing we expect in the fall. This is hunting season. It's not something that I expect to live with for the rest of my life throughout my days * * *."

Claude Brisson, previously referred to as a member of Paul Hugo Farms, testified as to its members' hunting habits at Rice Lake:

" * * * Well, we know that on Rice Lake there is probably at the most fifteen or twenty guys at any one time, and that is only for the first couple of weeks, and after that it dwindles down to maybe two or three guys on a weekend."

He further testified:

" * * * I would say for the first month, from the time the season opens, first four weekends, the opening day there is probably fifteen to twenty hunters. And then from there it dwindles down to probably three or four hunters on a given morning on a weekend. And that's about the extent of it. Because that's the way it has always been."

The Bald Eagle Sportsmen's Association, located 1½ miles south of the White Bear Gun Club, in a direction away from Rice Lake, also has shooting facilities. The only testimony on the record that sounds from the Bald Eagle club were at times as noisy as from the Gun Club came from Stephen Chapman, who testified that his property is 4400 feet from the Gun Club and only 2000 feet from the Bald Eagle club. Chapman said that at times, depending on the wind and type of shooting, he could hear shooting from the Bald Eagle club more clearly than that from the Gun Club. However, he testified that the shooting at the Bald Eagle club, which has been in existence for 20 to 25 years, was much less frequent than at the Gun Club. Other witnesses testified that the noise from the Bald Eagle club was not significant. For example, William Hanson, an area resident, testified that "If [the Gun Club and the Bald Eagle club were] shooting at the same time, the White Bear I would say would have to be very predominant."

This and other evidence clearly supports the trial court's finding that the Bald Eagle club "involves slow shooting generally and it has not been any special problem to residents in the vicinity, although the shots are heard."

In addition to the Paul Hugo Farms and the Bald Eagle club, the Wild Wings Game Farm is located approximately 2 miles southeast of Rice Lake. This club has several hundred acres and is used for hunting, and there was practically no evidence of any kind regarding a noise problem from the Wild Wings club. Significantly, it should be noted that there is no claim by anyone that lead shot from the Bald Eagle club or the Wild Wings club falls into the wetlands surrounding the lake where it can be ingested by wildlife and waterfowl.

In our opinion, the test conducted by Perez and the test conducted by International Acoustical Laboratories, Inc., the extensive testimony from nearby residents, and testimony regarding the long hours of shooting allowed by the special use permit[8] fully

---

**8.** As stated previously the permit allows shooting 365 days of the year and provides that shooting hours shall be from 10:00 a. m. until 6:00 p. m. on Sundays and holidays, and from 10:00 a. m. to 9:00 p. m. on weekdays. There was evidence that nonmembers of the Club are welcome to use the shooting facilities for a fee. An advertisement was placed in evidence in which the Gun Club held itself out as being open to the public, and there was no evidence to dispute that fact.

Jerome Perron, the president of the Gun Club, testified as follows:

"Q What do you anticipate—You think you're going to get bigger, don't you?

"A We certainly hope to get bigger.

　　*　　*　　*　　*　　*　　*

"Q * * * It's an excellent facility, and one that might attract members, wouldn't you agree?

"A I would think it would be, yes.

　　*　　*　　*　　*　　*　　*

"Q The public can come to your place and shoot any time, can't they?

"A Yes, we're open to the public.

"Q Every day that you shoot?

"A Yes, I guess so."

In discussing particular projects at the Gun Club, Perron testified as follows:

"Q This second statement here, 'For two nights a week, 100 persons for summer league shooting from about 6:30 to 8:30 from April to September.'

"A I would suspect that would relate to the two nights a week that the club has generally had league shooting for members.

"Q And when is that?

"A It's been normally I believe Tuesday and Thursday.

"Q Tuesdays and Thursdays, week nights. So that we might expect that in addition to Saturday and Sunday operation, there would be league shooting up until when? Nine o'clock on those two nights a week?

"A It's normally, oh, about a six to eight period. In other words, about a two-hour period I would guess."

In discussing his hope to have the state trap shoot meet at the Gun Club, he testified as follows:

"Q Well, okay, let's get some numbers then. In terms of the heaviest participation, what do you see?

support the trial court's finding that "[i]t is likely that it is impossible for the defendant Club to operate without unreasonable material acoustical degradation of the surrounding environment."

2. Plaintiffs' second allegation was that lead shot from the skeet and trap shooting falls upon a substantial area of the wetlands near the lake in the area of the Gun Club and is ingested by wildlife causing its destruction because of the toxic effects of ingestion of lead shot. Plaintiffs first presented evidence as to the amount and presence of lead shot caused by the shooting at the Gun Club. Dr. Stephen Chapman, a research scientist, a former professor at the University of Minnesota, and a consultant to the Pollution Control Agency on airport noise problems, who also owns and occupies land in the neighborhood of the Gun Club, testified on behalf of plaintiffs that if each of the present active members of the Gun Club, without taking into consideration future increases in membership or the use of the club by guests of members, were to shoot a single box of shells each week, 11 tons of lead would be deposited upon the wetland area each year. Dr. Chapman thought it more likely that 4 times this amount would be used by each member, making a total deposit of 44 tons per year.

Plaintiffs then presented testimony from Dr. James Cooper, professor of wildlife ecology at the University of Minnesota, that a wetland is the worst place for the location of a trap-shooting facility. Cooper studied the area surrounding the Gun Club's property and observed that the shooting is in the direction of the marsh so that lead shot falls onto the vegetation where the waterfowl feed. He stated that the lead shot would remain on the surface of the marsh where it would likely be ingested by the waterfowl and would result in lead poisoning unless the shot was removed from the ground. Since migratory birds would move on to die, the mortality rate within the immediate area would not fully establish the extent of the harm done.

"A  I'm sure the records speak for themselves, but from my experience, you might be looking at 500 shooters on the heaviest day.

Part of Dr. Cooper's testimony was as follows:

"Q  Now, is there a value to temporary water areas for waterfowl?

"A  Yes. In fact we're learning now that these temporary water areas are of great significance to waterfowl. * * *

"Q  Okay. Would you consider the area you observed on the gun club property as such an area?

"A  In years—This year we've got relatively low water because we have had a dry winter, a dry fall. It's not flooded to any degree. There are some open areas there that will be used by mallards, no question about that this year. In a wet spring with more flooding back into that area, of course, the use will be proportionately higher, so it will be somewhat variable. The greatest use will be in those years in which we get flooding say three to four inches over most of the vegetation.

"Q  Now, what will the birds, these waterfowl, do when they get in those areas?

"A  They'll seek out invertebrates. * * And in addition to that, although I suspect we didn't find any sand or gravel areas, if there were sand or gravel areas in along these springs, they would seek out grit. * * *

"Q  Are you a duck hunter?

"A  Yes, I am.

 *     *     *     *     *     *

"Q  So you are familiar then with the sound of shot from a shotgun falling around you?

"A  Unfortunately, yes.

"Q  When you were standing [on] the gun club's land, were you able to hear the noise of shot falling?

"A  Yes, quite clearly, I could hear the noise of the shot. * * *

 *     *     *     *     *     *

"Q  Five hundred?
"A  Yes."

"Q Okay, you were able to observe the condition of the swamp where you were standing?

"A That's correct.

"Q When that shot falls down on that kind of thing, what happens to it?

"A Well the condition of the marsh where we were standing there is no question in my mind that most of that shot is going to stay near the surface. * * *

"Q Could ducks pick it up in the course of their feeding?

"A Yes, certainly.

"Q How likely is that in your view?

"A Well, in these areas where they're shooting right now, where the shot is being deposited and unless the shooting is removed in some manner, a year from now any duck that did frequent the small wetland there and feeds, is very, very likely to get a lethal dose of lead shot.

* * * * * *

"Q What's the significance of poisoning one or two mallards in the ecological niche? How many are we talking about?

"A That, again, is difficult to assess in terms of numbers. The ducks that will be found dead on that site certainly will represent only a minute portion of the birds that are actually being poisoned there. There are two factors. One, ducks in migration stop and feed and then move on, and stop and feed. So any migrant that's stopping there picking up a lead dose may well move on a hundred miles before this lead begins to really affect it. So those won't be detected. Locally, birds can pick up lead there and essentially move on a couple of miles, die in the marsh, and you'd never know it. So how many mallards would be affected and what is the effect of losing ten mallards, we can't say we'll only lose ten mallards. We may lose three or four hundred, and on a continental basis this is relatively small. On a

local basis, this certainly could be significant. We could lose continual loss of birds there because of poisoning, and birds picking up shot there in migration are affected, too."

Dr. Cooper was also questioned about the effect of the Paul Hugo Farms shooting at ducks over the lake. That testimony went as follows:

"Q Do you agree or disagree that direct introduction of lead to the water and to all of the surrounding portions of the lake would be more or less damaging to the ecological standards than the gun club?

"A It would be less, no question.

"Q The gun club.

"A No, the deposits of lead in that lake would have much less effect on the birds, the ecological system, than the heavy deposits that will occur in gun club area."

Finally, Dr. Cooper concluded, "I guess if I had to choose a spot from the standpoint of say, lead poisoning waterfowl and the trapshooting that I've done, a wetland would have been the last place I'd have put it."

Plaintiffs then presented Dr. Miron Heinselman, a professor at the University of Minnesota and a specialist in wetland and peat bog ecology, who described the area around Rice Lake as a glacial drift region. Dr. Heinselman testified that mineral soil on the edge of the peatland causes a flow of water, along with the lead shot, into the lake and into the deep soft peat close to the Gun Club property.

The principal emphasis of Dr. Heinselman's testimony was to describe the area around the lake near the Gun Club, the value of that area for the feeding of ducks, and the great difficulties that would be encountered in trying to remove the fallen lead shot. Dr. Heinselman testified as follows:

"A * * * I spent an afternoon and evening walking the area including the gun club property and from there north to the lake itself. The

marsh was freezing over, the wetland was freezing over, so we were able to walk almost to the water's edge at that time.

*       *       *       *       *       *

" * * * Anyway, we entered the area from the hill on which the gun club shooting occurs now, * * * and walked out into the wetland in this general route and we worked back and forth a great deal and worked our way ultimately out onto the cattail marsh * * * we walked back more or less this way through the swamp forest and shrub wetland and back to the Schletty farm.

*       *       *       *       *       *

" * * * [T]here were several areas in this general area that definitely had springs * * *.

*       *       *       *       *       *

"Q   How big were those springs?

"A   Oh, they were several feet in diameter and irregular in shape.

*       *       *       *       *       *

"Q   Were there any club facilities in at that time?

"A   Yes, there were several, as I recall, several partially constructed shooting positions or bunkers or whatever. * * *

"Q   Did you measure the distance between [the club shooting facilities] and the springs?

"A   Yes, we walked, we paced the distance out.

"Q   What direction and how far?

"A   It was essentially straight south from the springs and a matter of seventy-five yards or something like that.

"Q   You've said you shoot trap and you are a duck hunter. Can shot carry that far?

"A   Yes, shot carries much farther than that. Several hundred feet.

"Q   Well, then I take it that the shot would be where the springs were?

"A   Yes, the shot would fall in the area of the springs or even beyond. * *

*       *       *       *       *       *

"Q   You heard Dr. Cooper's testimony this morning concerning his expectation of the feeding habits of ducks and the value of that wetland area that you are talking about for ecological life of ducks. Would you tend to agree that that is a valuable area for duck feeding?

"A   Yes, I understand the value of an intermittently wet marsh and forested swamp area adjacent to a waterfowl lake. And it's my understanding also that this is very valuable wetland habitat for several species of ducks and I'm aware of the species. * * * "

When questioned about the possibility of removing the lead shot from the area, Dr. Heinselman testified as follows: [9]

"Q   What could the gun club do about the shot that would be deposited in that wetland area to prevent the lead pollution you speak of and the danger to waterfowl?

"A   Well, the only thing that could be done is that if there was some means devised to physically remove the lead very frequently so it didn't have an opportunity either to be ingested by waterfowl that may being using the area or go into solution. And that would mean very frequent removal. I find myself having great trouble visualizing a collection of shot in that area. It seems to me an extremely difficult place to recover lead shot.

"Q   Knowing how the marshland or the peatland there is constructed, knowing its characteristics, how could they go about removal?

9. The Minnesota Pollution Control Agency wrote to the Gun Club on August 7, 1975, to advise them that removal of lead shot would be required.

"A  Well, I can't think of any very feasible way frankly, but I can suggest a couple of things that I suppose somebody might try.  You could use bulldozers with front-end loaders on them and every week or two make a pass across this entire area—and we're talking about twenty acres or more, I suppose, of impact area—and remove a thin layer of the surface peat.  I think this would be difficult because it's woody peat, it will be full of the roots of trees, etc., and I don't think you're going to have much luck with taking off a thin layer.  I think you are going to find you have to take it all off or not much at all.  I suppose the other thing would be to cover the surface of the peatland with mineral soil and that would be very damaging to the wetland, but if you did that, then you could, I suppose, scrape off a thin layer of the mineral soil intermittently and get the shot.

"Q  Okay.  If you did put a layer of mineral soil out there where the shot fell, what would happen to the wetland between there and the high ground?

"A  Well, you'd be capping this area in here (indicating) with a layer of mineral soil, you'd be capping the springs, you'd be putting a new source of nutrients into the peatland which would change the water chemistry.  And the water is going outward into this portion of the wetland so you'd be changing the vegetation, probably changing the vegetation of the areas toward the lake which are off the gun club's property and, of course, you'd be completely destroying the natural wetland in this particular area.  The waters from the springs would still find their way out of that area somewhere.  You're not going to shut off that water.  It would either pass under the mineral soil you put on there or else it would find its way to the surface and run across the mineral soil."

Dr. Chapman, based upon his own personal observations, confirmed the testimony of Dr. Cooper and Dr. Heinselman that a substantial amount of lead caused by the Gun Club's operations falls on the area near the lake.  He also confirmed the deleterious effect that the ingestion of the lead shot would have on wildlife.

Based upon this testimony, the trial court found that lead shot deposited by the Gun Club on the wetland area would affect waterfowl and other wildlife by ingestion of lead shot, and that the lead shot could not be removed because of the spongy marsh without the substantial destruction of the wetland area.[10]

█  In our opinion, the evidence produced by plaintiffs clearly established that the Gun Club's use of its property as a trap-and-skeet-shooting facility would materially adversely affect the natural resources of the area.  Once this prima facie case of pollution, impairment, or destruc-

---

10.  Specifically, the trial court found, in part, as follows: " * * * The marsh area is so soft that it would be a difficult place to remove shot frequently as should be done.  One would have to remove quantities of the peat in order to remove the shot.

> *  *  *  *  *  *

" * * * The shot falling in the marsh or swamp will remain there mostly near the surface so that one can pick it up.  Birds breeding are apt to pick up shot.  Unless shot is removed from the ground once a month, lead poisoning will surely occur.  Migrant birds may well move on to die, so that the deaths within this wetland area cannot establish the full extent of harm done.  Lead affects the bodily condition of the fowl so that they cannot eat well or breed and the productivity of the birds is reduced.  Lead in solution has a distinct effect on the fowl.  A wetland area is the worst possible place for a gun club.  Acoustically, the shooting at the defendant Club is disturbing to both fowl and people.  The noise from the shooting might not have a significant effect on local ducks that are semi-permanent on the lake or in the marshes.  It would have a serious effect on migratory birds which are either not accustomed to much noise or are fleeing from hunters elsewhere.  Canadian geese would probably avoid the lake if the trap and skeet shooting continues."

tion had been shown, the burden was upon the Gun Club to rebut plaintiffs' case by the submission of evidence to the contrary or by way of affirmative defenses.

However, only the following testimony was submitted by the Gun Club:

(a) Its president, Jerome Perron, testified concerning details of the acquisition of the property, the issuance of the permit, and the construction of the facilities. He also testified that in his opinion the noise from the Gun Club was minimal.

(b) An employee of the engineering firm for the Rice Creek Watershed District testified briefly on direct examination that, based upon some soil samplings and a determination of the percentage of water that would drain from the site into the St. Paul water supply, the Rice Creek Watershed District had no objection to the proposed Gun Club.

(c) A former owner of the property now owned by the Gun Club testified that although she had heard there was a spring on the property, she had never seen one, nor had she seen ducks nesting on the land.

(d) A resident of Hugo who had developed some residential units in the vicinity of Rice Lake testified that in his opinion the Gun Club operation had not affected their value.

(e) A member of the Hugo City Council at the time the permit was issued testified as to the details of its issuance and to the conditions which were made a part of the permit.

█ In our judgment, based upon our study of the entire record, the trial court properly found that the Gun Club had failed to rebut plaintiffs' prima facie showing that the Gun Club's use of the property would materially adversely affect the natural resources of the area. It should be clearly noted that defendant made no attempt to show that the operation of the Gun Club could be conducted in such a way, whether by use of steel shot instead of lead shot or through any other means, that it would not materially adversely affect the natural resources of the area. Since de-

fendant made no effort to show that there was no feasible and prudent alternative to the Rice Lake location and that its conduct was consistent with and reasonably required for the promotion of the public health, safety, and welfare, there was no rebuttal by the affirmative defenses allowed by Minn.St. 116B.04.

Although defendant pleads hardship by reason of being denied use of its present location, Minn.St. 116B.04 clearly states that "[e]conomic considerations alone shall not constitute a defense hereunder." Moreover, defendant had been warned by the district court at the time plaintiffs' motion for a temporary restraining order was denied that "it must bear the risk of being limited or totally enjoined in its use of this land as a gun club." The trial court, in this action, in a memorandum made part of its findings, expressed deep concern because of defendant's substantial investment, but observed that "the club proceeded from the beginning with notice and reminder of the risks." In the order denying a stay of the injunction on July 1, 1976, the trial court stated:

" * * * The club proceeded from the beginning in defiance of the public interest or the right of the public to stop it.

"In the present proceeding, it seeks to show the hardship the club would suffer by being denied the use of its facilities. Our position has to be that it is a hardship which the club itself chose to risk from the beginning."

Therefore, we hold that the Gun Club's economic considerations alone do not constitute a defense sufficient to rebut plaintiffs' prima facie showing. See, *State v. City of White Bear Lake*, Minn., 247 N.W.2d 901 (1976).

█ The Minnesota Environmental Rights Act, Minn.St. c. 116B, a far-reaching legislative enactment, has created, in effect, a right in each person to the preservation and protection of natural resources within the state and has provided a legal remedy for the effectuation of those rights. In the instant case the trial court found that the conduct of the defendant Gun Club materi-

ally [11] adversely affects the environment. It also found that plaintiffs had established that defendant's conduct is likely to cause pollution, impairment, or destruction of natural resources. The trial court concluded that defendant had not rebutted those facts by way of contrary evidence, or by way of an affirmative defense by showing that there was no feasible and prudent alternative and that defendant's conduct was consistent with and reasonably required for promotion of the public health, safety, and welfare.

The Minnesota Environmental Rights Act does not prescribe elaborate standards to guide trial courts, but allows a case-by-case determination by use of a balancing test, analogous to the one traditionally employed by courts of equity, where the utility of a defendant's conduct which interferes with and invades natural resources is weighed against the gravity of harm resulting from such an interference or invasion.[12]

The trial court applied such a balancing test in the instant case as evidenced by the following finding of fact:

"The Court has weighed the benefits to users together with the fact of an apparently substantial investment as against the damage likely to be caused to the protectable natural resources in the wet-

land area. The benefits of the Club are temporary. The desire and reasonable probability is that the Rice Lake wetlands area would, but for the Club, otherwise be preserved permanently and for future generations. There has been substantial showing that the defendant has caused and is likely more permanently to cause, the pollution, impairment or degradation of the air, water, land and other resources located within Minnesota; and the Court so finds. There are other feasible and prudent alternative places for the conduct of such shooting activities. The conduct of the Club at the place where it is presently established is not reasonably consistent with the promotion of the public health and welfare in light of the State's paramount concern for the protection of its natural resources. It is necessary to enjoin the trap and skeet shooting at the White Bear Rod and Gun Club in order to protect, preserve and enhance for the plaintiffs and the people of Minnesota generally the air, water, land and other natural resources within the State. Plaintiffs have no adequate remedy at law."

The question to be determined by us on this appeal is whether the trial court's findings of fact are clearly erroneous.[13] Under the clearly erroneous rule

11. Defendant argues that we should read the word "substantially" into the statute. In our judgment the word "materially" carries the same effect and meaning and it is, therefore, not necessary to judicially insert the word "substantially" into the statute.

12. The Michigan Supreme Court in *Ray v. Mason County Drain Commissioner*, 393 Mich. 294, 224 N.W.2d 883 (1975), discussed the discretion given to the courts to determine if there has been a violation of environmental rights even in the absence of established standards or statutes. The court stated: "The Legislature in establishing environmental rights set the parameters for the standard of environmental quality but did not attempt to set forth an elaborate scheme of detailed provisions designed to cover every conceivable type of environmental pollution or impairment. Rather the Legislature spoke as precisely as the subject matter permits and in its wisdom *left to the courts the important task of giving substance to the standard by developing a common law of*

*environmental quality.* The act allows the courts to fashion standards *in the context of actual problems* as they arise in individual cases and to take into consideration changes in technology which the Legislature at the time of the act's passage could not hope to foresee." 393 Mich. 306, 224 N.W.2d 888. (Emphasis supplied.)

13. In our most recent environmental case, *Reserve Mining Company v. Herbst,* Minn., 256 N.W.2d 808 (filed May 27, 1977), we distinguished between the standard of review where a district court has served as an appellate tribunal with respect to an administrative agency decision and the deference to be accorded to a district court which has acted as finder of fact. Although it is our function in cases like *Reserve Mining* to make an independent examination of the administrative agency's record and decision and to arrive at our own conclusions without according any special deference to the review of that record and decision by the trial

findings of fact by the district court may be set aside only if this court on the entire evidence is left with the definite and firm conviction that a mistake has been made. *In re Estate of Balafas*, 293 Minn. 94, 198 N.W.2d 260 (1972). We hold that the evidence in this case fully supports the trial court's findings and conclusions and that those findings are not clearly erroneous.

The Gun Club claims that under the terms of Minn.St. 116B.08, subd. 1,[14] which provides for remittitur by a trial court under certain circumstances, this matter should be remitted to the Hugo City Council and the Minnesota Pollution Control Agency for further administrative action.

█ It is clear that the city of Hugo has no authority to issue a permit or grant a variance which allows pollution, impairment, or destruction of the environment within the meaning of c. 116B. An eminent domain action by a governmental subdivision was disallowed in the second Bryson case in which we observed:

"* * * Indeed, as a political subdivision of the state, the county has a greater duty than does a private individual to see that legislative policy is carried out. As a creature of the state deriving its sovereignty from the state, the county should play a leadership role in carrying out legislative policy." Minn., 243 N.W.2d 321.

█ Further, the trial court, in response to defendant's request for remittitur, stated that "* *- * [n]o administrative, licensing or other similar proceedings are required to determine the legality of the gun club conduct * * *." Our review of the record compels us to concur in that conclusion.

Nothing in this opinion is intended to preclude the Gun Club from taking whatever actions may be necessary to remedy the conditions found by the trial court to constitute pollution, impairment, or destruction of the natural resources, and, upon proper application and submission of sufficient evidence thereof to the trial court, resuming use of its property within limitations required by the Minnesota Environmental Rights Act. Whether it is physically possible for the Gun Club to accomplish that goal is, of course, not at this time ascertainable by this court based upon the record before us.

The judgment of the trial court is affirmed.

Affirmed.

TODD, Justice (dissenting).

I respectfully dissent from the majority opinion. In so doing, I do not intend to deter the proper application of the Minnesota Environmental Rights Act, Minn. St. c. 116B. Rather, in order to preserve our environment, I believe it is necessary that statutes enacted to accomplish this purpose should be properly applied. To permit the misapplication of such statutes will only discredit such laudatory legislation and encourage its abuse.

In reaching their respective determinations, the majority opinion and the trial court consider the issues of noise and lead-shot pollution. This dissent will address briefly each of the aforementioned issues in order.

The majority opinion states that the operation of the Gun Club in the Rice Lake area

---

court, in the instant case the trial court sat as a court of first impression and not as an appellate tribunal. Thus, our scope of review must be based on the clearly erroneous standard of Rule 52.01, Rules of Civil Procedure, and not on the provisions of the Administrative Procedure Act, Minn.St. 15.0425.

**14.** Minn.St. 116B.08, subd. 1, provides in pertinent part: "* * * *If administrative, licensing, or other similar proceedings are required* to determine the legality of the defendants' conduct, *the court shall remit* the parties to such proceedings. *If administrative, licensing, or other similar proceedings are available* to determine the legality of the defendants' conduct, *the court may remit* the parties to such proceedings. In so remitting the parties the court may grant temporary equitable relief where appropriate to prevent irreparable injury to the air, water, land or other natural resources located within the state. In so remitting the parties the court shall retain jurisdiction of the cause pending completion thereof." (Emphasis supplied.)

is in violation of Minn.St. 116B.02, subd. 5. This definitional statute provides:

> " 'Pollution, impairment or destruction' is any conduct by any person which violates, or is likely to violate, any environment quality standard, limitation, regulation, rule, order, license, stipulation agreement, or permit of the state or any instrumentality, agency, or political subdivision thereof which was issued prior to the date the alleged violation occurred or is likely to occur or any conduct which materially adversely affects or is likely to materially adversely affect the environment; provided that 'pollution, impairment or destruction' shall not include conduct which violates, or is likely to violate, any such standard, limitation, regulation, rules, order, license, stipulation agreement or permit solely because of the introduction of an odor into the air."

It is readily apparent from the language of this statute that a complaining party can establish that the conduct of a person amounts to pollution, impairment, or destruction of the environment through two possible means. The plaintiff can prove that the conduct in question violates, or may violate, any environmental quality standard, rule, or regulation of the state or any political subdivision thereof. He also may establish a violation by proving that the conduct complained of "materially adversely affects or is likely to * * * affect" the environment.

With reference to the first method of establishing that certain conduct amounts to pollution of the environment, Minn.St. 116.07, subd. 2, mandates that the Pollution Control Agency (PCA) adopt · statewide standards relating to the maximum levels of noise permissible in a given area:

> "The pollution control agency shall also adopt standards describing the maximum levels of noise in terms of sound pressure level which may occur in the outdoor atmosphere, recognizing that due to variable factors no single standard of sound

pressure is applicable to all areas of the state. Such standards shall give due consideration to such factors as the intensity of noises, the types of noises, the frequency with which noises recur, the time period for which noises continue, the times of day during which noises occur, and such other factors as could affect the extent to which noises may be injurious to human health or welfare, animal or plant life, or property, or could interfere unreasonably with the enjoyment of life or property. In adopting standards, the pollution control agency shall give due recognition to the facts that the quantity or characteristics of noise or the duration of its presence in the outdoor atmosphere, which may cause noise pollution in one area of the state, may cause less or not cause any noise pollution in another area of the state, and it shall take into consideration in this connection such factors, including others which it may deem proper, as existing physical conditions, zoning classifications, topography, meteorological conditions and the fact that a standard which may be proper in an essentially residential area of the state, may not be proper as to a highly developed industrial area of the state. Such noise standards shall be premised upon scientific knowledge as well as effects based on technically substantiated criteria and commonly accepted practices. No local governing unit shall set standards describing the maximum levels of sound pressure which are more stringent than those set by the pollution control agency."

It should be noted that at the time of trial the PCA had not adopted objective standards which set the maximum levels of sound pressure permissible in our state. The city of Hugo apparently did not enact objective noise pollution standards for the community because § 116.07 precludes a local government unit from establishing standards which are more stringent than those set by the PCA.[1] The absence of any

---

1. When granting the White Bear Rod and Gun Club a special use permit to operate on the Rice Lake site, the city of Hugo also established a maximum noise limit of 40 decibels which the Gun Club could not exceed and still comply with the permit. The problem with this

objective standards setting the maximum levels of sound pressure allowable in the state or the city of Hugo foreclosed plaintiffs from establishing a violation pursuant to the first method, since it is rather obvious a person cannot be said to have violated a nonexistent standard or regulation.

When the PCA adopts objective statewide noise pollution standards in the future, either the state or a private citizen may establish a prima facie showing of noise pollution by introducing evidence that the everyday operation of a particular enterprise violates the PCA standard.[2] Without PCA action to enact statewide noise pollution standards, a private citizen may nevertheless prove a violation of our environmental statutes by introducing evidence which demonstrates that the defendant's conduct materially adversely affects the environment.[3] I believe that in order to sustain their statutory burden of proof that the defendant's conduct materially adversely affects the environment requires the private citizen plaintiff to:

(1) Introduce evidence at trial from which the trial court can establish, in its findings of fact, a maximum objective level

of sound (in decibels) which is reasonable for the area in question; and

(2) Make and introduce the results of scientific noise tests made of the defendant's usual, everyday conduct to determine whether such conduct exceeds, and therefore violates, the previously established reasonable noise level.

In the instant case, plaintiffs elected to pursue their action against the Gun Club by the second method which requires proof that defendant's conduct is or is likely to materially adversely affect the environment. In proceeding by this means, the complaining party is required to make a prima facie showing that the conduct of the defendant "has, or is likely to cause the pollution, impairment, or destruction of the air, water, land or other natural resources located within the state." Minn.St. 116B.04. I respectfully suggest that plaintiffs failed to establish a prima facie showing of noise pollution.

I premise this conclusion upon the sincere belief, as I stated previously, that in order for plaintiffs to make a prima facie show-

---

particular attempt by the city to limit the amount of noise from the Gun Club property is twofold. First, as Mr. Justice Kelly describes in his dissent, the 40-decibel requirement is a totally unrealistic limitation since even the sound produced by normal vocal conversation (66 decibels) would exceed this noise level. Secondly, the city faces the obvious problem that a local governmental unit is prohibited from adopting maximum levels of sound pressure which are more stringent than those established by the PCA pursuant to the provisions of Minn.St. 116.07, sub. 2. Thus, given this statutory language, it would indeed be ludicrous to allow the city to adopt and enforce the unrealistic limitation included in the special use permit merely because of the absence of PCA action in enacting statewide sound level standards.

2. Furthermore, when state sound level standards are adopted by the PCA, they must apply to all gun clubs within the state with appropriate variations for existing geographical differences as required by statute. Recently, in *Reserve Mining Company v. Herbst,* Minn., 256 N.W.2d 808, 837 (filed May 27, 1977), we held that air pollution standards affecting one taconite plant must apply to all taconite plants in the state: "We construe the Federal court deci-

sion to establish as the law quite clearly requires, a single standard for all plants causing air emissions which may be potentially dangerous to health, wherever they may be located in this state."

I fail to perceive any distinction in the present case. The statute mandates that the PCA shall adopt statewide noise pollution standards. I would assume that the standards, once adopted, would apply to all gun clubs in the state with such modifications as geographical differences dictate.

3. Once the PCA adopts standards setting the maximum levels of sound permissible for certain activities, I would assume that the PCA standards would preempt the citizen's right under our present laws to prove a violation of the environmental statutes by demonstrating that the defendant's conduct materially adversely affects the environment. I reach this conclusion because to permit a private individual to pursue a cause of action by this method rather than by proving a violation of the statewide standard could lead to the absurd result of allowing a citizen to enforce a more exacting noise level standard than that deemed reasonable by the PCA in adopting the statewide standard.

ing of pollution under § 116B.04, without benefit of an existing state or community noise pollution standard, should require the presentation of sufficient evidence upon which the trial court can establish, in its findings of fact, a maximum objective level of sound which would be reasonable for the particular locale. After establishing the sound level permissible in the area, scientific tests should have been made of the everyday conduct of the operation of defendant's business or activity and the results of the tests introduced into evidence to determine whether such conduct exceeds the maximum noise level. Upon satisfying these two criteria, and provided the sound emanating from defendant's activity exceeds the established standard, plaintiffs would have made a prima facie showing of noise pollution. The burden of proof would then shift to defendant to rebut the prima facie showing and, as dictated by statute, economic considerations, standing alone, are insufficient to successfully rebut the showing. Minn.St. 116B.04.

By requiring plaintiffs to meet this dual test in order to make a prima facie showing of noise pollution results in two beneficial aspects. First, the court will gain the benefit of objective criteria introduced by plaintiffs upon which it can determine and establish a maximum level of sound (in decibels) which is reasonable for the area. By setting the reasonable level of sound, the trial court will be afforded an objective standard against which defendant's conduct can be measured to determine the existence of a violation of our environmental statutes. Under the majority opinion, the decision of whether certain conduct amounts to noise pollution must be made by the court with reference only to vagaries attendant to the words "materially adversely affects." To permit a violation of our environmental

statutes to be based solely upon such imprecise terms could lead to the manipulation of the same statutes against enterprises based upon speculative, conjectural evidence, wholly unrelated to the everyday operation of such enterprise. This is precisely what occurred in the instant case. The trial court and the majority opinion both make the statement that scientific noise studies were made of the everyday operation of the Gun Club by Mr. Alfonso Perez of the Noise Pollution Control Section of the PCA. This is an inaccurate characterization of the "tests" that Mr. Perez actually conducted and is one of the reasons that I am presently advocating a more rigorous evidentiary requirement for prospective plaintiffs in order to establish a prima facie showing of pollution.

What did occur was that in March 1974, Mr. Perez appeared at the proposed construction site at the request of the Gun Club. At that time, one shooter stood in the open field area of the proposed trap site and fired his gun while Mr. Perez took various readings at several locations. A second noise test was staged at the requests of plaintiffs. In August 1975, 16 shooters were assembled along the east property line of the Schletty property which abuts the Gun Club property. As they fired their shotguns, Mr. Perez took readings at different locations. Apparently 16 shotguns were fired to simulate the noise from the 16 trap stations at the Gun Club if all were operative at once.[4]

The accuracy of this particular test in providing an adequate measure of the noise that will emanate from the Gun Club in its normal operation is questionable since under no circumstances could every station be operative at the same time. The Gun Club has 12 trap stations and 4 combination trap

4. In addition, the firing of 16 shotguns to simulate the everyday conduct of the Gun Club ignores the physical realities of the actual nature of a gun club in operation. It is undisputed that during the vast majority of the time the Gun Club is operating, only 2 to 4 of the 16 gun stations available are actually used. It is equally obvious that only one shooter can fire a gun at a time at each station. He will fire at

either a single or double target. When he is finished, the next shooter will step forward and fire his gun. The fact that 5 shooters are physically present at each station does not mean they all fire their guns at the same time since this would necessitate firing at the same target which would defeat the purpose behind trap and skeet shooting.

and skeet stations. The evidence indicates that if a state meet were held at the Gun Club, 12 stations would be used, but in its normal operation 2 stations are generally used and 4 stations can adequately accommodate any special events that would be held at the Gun Club. Thus, noise test results premised upon the firing of 16 guns have little probative value in demonstrating the noise levels being generated by the everyday operation of the Gun Club.

For reasons unexplained in the record, scientific noise studies were not made of the operation of the White Bear Rod and Gun Club after its completion. If plaintiffs had been required to introduce evidence upon which a reasonable maximum level of sound for the particular area in question could have been established by the court and to make scientific noise studies of the normal, everyday operation of the Gun Club enterprise, the Gun Club may have then faced the possibility of a permanent closing of its facilities. However, a result attained after such a demonstration of proof would be more consistent with my concept of justice than the present decision which is based upon tests made of the Gun Club under artificial conditions and the results which were judged against the inherent vagueness of the words "materially adversely affects" in determining the existence of a violation.

The second benefit which would follow from the requirement of establishing a maximum level of sound for the area is that defendant would be afforded an objective standard to conform the operation of its business. The majority opinion states that, under the present decision, the defendant may modify its activities to comply with the Minnesota Environmental Rights Act and then apply to have the injunction lifted. If an objective maximum level of noise would have been established for the Rice Lake area in this case, defendant would have been presented with a definite standard to place the conduct of its business within and eventually resume the use of its property. However, it is beyond my comprehension how defendant could modify its existing facilities and definitely know that such modification would allow the Gun Club to resume its operation without the presence of an objective standard to determine the need for any given change.

I also must take issue with the finding of the trial court and its affirmance by the majority opinion that plaintiffs established a prima facie showing that the noise generated by the everyday operation of the Gun Club will materially adversely affect the environment in the Rice Lake area. In so doing, I do not dispute the testimony of numerous individuals concerning their estimation of the sound which the conduct of the Gun Club produces. However, as I stated previously, there were not any scientific noise tests of the actual, everyday operation of the Gun Club. I am unaware of any instance in the history of this state where an enterprise has been permanently enjoined from operating on data wholly unrelated to its everyday business operation. The mere existence of this fact renders the present decision to permanently enjoin the White Bear Rod and Gun Club from operating in the Rice Lake area unjust.

One of the goals established in § 116D.02, subd. 2(q), is to minimize noise, particularly in urban areas. As the majority opinion notes, quietude is a natural resource under § 116B.02, subd. 4. However, § 116D.02, subd. 2(d), seeks to preserve important historic, cultural, and natural aspects of our national heritage and maintain, whenever practicable, an environment that supports diversity and variety of individual choice. Thus, it is apparent that the existence of a gun club, as well as other private, individual activities, in any area necessarily requires a balancing approach so as to achieve maximum enjoyment and protection of our resources consistent with the diversity and variety of individual choice.

Both the majority opinion and the trial court make the general statement that the Rice Lake area is a quiet, serene place. This statement does not comport with the evidence introduced at trial. Thus, the erroneous characterization of the Rice Lake area as quiet and serene may have contributed to placing a greater weight in favor of

the environmental quality of the Rice Lake area when balancing the area's beneficial aspects with any possible adverse impact occasioned by the operation of the Gun Club. The entire shoreline of Rice Lake, except for a very small area in the northeast corner, is owned by Paul Hugo Farms, Inc., as part of its 320-acre holdings. One of the purposes of acquiring the property was to provide duck-hunting facilities for the members of the organization. In addition, the members occasionally engage in trap shooting on the property. Admittedly, this shooting is substantially less in degree than what occurs at a gun club. Nevertheless, the trial court did express concern over the inconsistent position of the members of Paul Hugo Farms who testified in opposition to the White Bear Rod and Gun Club. One can only speculate that their opposition was not related to environmental matters. The effect of the existence of the Gun Club in close proximity to their hunting area cannot escape notice.

The Bald Eagle Sportmen's Association operates a rod and gun club located 1½ miles south of the White Bear Rod and Gun Club. It does not operate as many shooting stations as the Gun Club, but an outdoor rifle range exists at the Bald Eagle facilities. The evidence discloses that the noise generated by the Bald Eagle rifle range is greater than that from the Gun Club trap and skeet stations where shotguns are used. Also, the Wild Wings Game Farm is situated approximately 2 miles southeast of Rice Lake where shooting occurs on a large tract of land on a year-round basis.

The operation of the aforementioned gun clubs within close proximity to Rice Lake indicates that the area is presently subjected to several infringements on its quietude. This fact is both relevant and material to a consideration of the propriety of the trial court's remedy of totally enjoining the operation of the Gun Club. Quietude is a quality, which by its very nature, should be considered in relation to the surroundings in which it is measured. While a particularly noisy activity may not be appropriate in a residential neighborhood, it may be acceptable in an industrial area. This is to suggest that characterizing Rice Lake as a quiet location not only is inconsistent with the evidence in this case, but also may have led the trial court to impose an unusually harsh remedy when compared to the degree of noise intrusion caused by the operation of the Gun Club.

Thus, I believe that the trial court decision regarding noise pollution should be reversed for two reasons. Initially, I believe that plaintiffs, in order to make a prima facie showing of noise pollution, should be required to—

(1) Introduce evidence upon which the trial court can establish in its findings of fact a maximum objective level of sound (in decibels) which is reasonable for the particular area; and

(2) Conduct and introduce the results of scientific noise tests of the usual, every day operation of the enterprise in question so that the trial court can determine whether defendant's activity violates the previously established reasonable standard.

Secondly, I believe that the remedy of a permanent injunction is excessive in this case given the presence of several infringements on the area's quietude before the construction of the Gun Club.

I also question the propriety of the trial court decision concerning the pollution of Rice Lake caused by the random showering of lead shot from the Gun Club property when in use. I believe that the remedy imposed by the trial court of totally enjoining the operation of the Gun Club is disproportionate to the actual problem presented when the evidence introduced at trial discloses a much simpler remedy.

Dr. James Cooper, testifying for plaintiffs, stated that in a short time waterfowl hunters in Minnesota will be required to use steel shot instead of lead so as to reduce the possibility of lead poisoning.[5] I cannot per-

---

**5.** It is a matter of public knowledge that in the immediate future the Department of Natural Resources will require steel shot to be used in 12-gauge shotguns in a large part of the State of Minnesota.

ceive of any reason why such a restriction could not be imposed here, if in fact a lead-poisoning problem does exist. Such a remedy is more consistent with my concept of justice than that imposed by the trial court and approved by the majority opinion.

I would reverse and remand this case to the trial court for the establishing of a reasonable sound level standard for the area and a determination of whether defendant's conduct violates the standard. In the final analysis, this case involves the imposition of a remedy which is completely disproportionate to the degree of harm established by the evidence. Further, more simply stated, it is the wrong remedy at the wrong time.

KELLY, Justice (dissenting).

I must respectfully dissent from the majority's position, for in my opinion the district court exceeded its authority in forever prohibiting trap and skeet shooting at the White Bear Rod and Gun Club. This harsh remedy was not justified by the evidence adduced or the equities advanced by plaintiffs.

I am mindful of the fact that the majority opinion would not preclude the Gun Club from remedying the conditions found by the trial court to constitute pollution and making application to that court for relief permitting it to use its property "within limitations required by the Minnesota Environmental Rights Act." But what are those limitations? Would 66 decibels of sound (normal vocal conversation) at the edge of the Gun Club property satisfy those limita-

tions? Unless the standards are set, how can the Gun Club plan to overcome the objections to noise? Minn.St. 116.07, subd. 2, set forth in Mr. Justice Todd's dissenting opinion, mandates that the Pollution Control Agency (PCA) adopt standards for the maximum levels of noise. That statute precludes local governmental agencies from adopting more stringent standards. It is doubtful that courts should do so. I join in Mr. Justice Todd's dissenting opinion, except as hereafter modified.

Plaintiffs cited the Gun Club as the source of two pollutants: noise and lead shot. The majority finds that the evidence abundantly supports plaintiffs' contention that both pollutants were "likely to materially adversely affect the environment." Minn.St. 116B.02, subd. 5. I do not dispute the abundance of plaintiffs' evidence—the length of the majority opinion is sufficient testimony to that—instead I dispute its probative value.

Mr. Justice Todd ably demonstrates the dubious character of plaintiffs' evidence of noise pollution. Mr. Alfonso Perez of the Noise Pollution Control Section of the PCA conducted two surveys of noise in the area of the Gun Club. After the first, he sent a letter to the president of the Gun Club advising him that the club would likely meet impulsive noise standards to be promulgated by the PCA.[1] A year later, Mr. Perez conducted the second survey at the request of plaintiffs. Inexplicably, the simultaneous firing of 16 shotguns was thought to be an accurate representation of trap and skeet shooting at the club. As Mr.

---

1. The letter read in substance: "As you have requested, the following are some observations on the proposed Hugo's Rod and Gun Club.

"The noise produced by a shotgun is classified as a impulsive noise in our proposed NPC–1 noise regulation. Our proposed regulation establishing noise standards for the State of Minnesota, NPC–2, does not include impulsive noises. Due to the complexity of human response to impulsive noises, further research will be conducted prior to proposing any standard for the State.

"On March 28, 1974, we conducted a survey of the noise produced by a single shooter on

the proposed site of the club and the noise received by homes on the perimeter of the club. As a result of this survey, it is my opinion, that the intensity of the sound measured at the various homes, most probably, will not exceed the limits of acceptability of future impulsive noise standards.

"This situation could easily change by construction of homes close to the club or improper management of the club. I hope that this fact is recognized by both the club and the community, and that future developments reflect the recognition."

Justice Todd observes, these results are largely irrelevant. But even assuming arguendo that they have some probative value, they reflect that the noise from the Gun Club (averaging 68 decibels at a point adjacent to the shooters) was akin to the sound produced by a voice in normal conversation (66 decibels). Such a noise level might well be disturbing in a true wilderness, but the waters of Rice Lake were stirred by more than an occasional breeze rustling grasses (32 decibels). A paved road runs immediately past the Gun Club. Moreover, as Mr. Justice Todd describes, other shooting facilities are present in the neighborhood.[2] Thus, the testimony of local residents as to the disturbing reports from the Gun Club needs to be discounted somewhat.[3]

The PCA has not yet adopted impulsive noise standards, and as indicated in Mr. Perez's letter (see, footnote 1, *supra*), it is not clear that the Gun Club could not meet the promulgated standards.[4] If so, the 40-decibel restriction prescribed in the special use permit would be without effect. Minn.St. 116.07, subd. 2. Furthermore, although defendant did not establish the defense suggested by Minn.St. 116B.04, i. e., that there was no feasible and prudent alternative location for the Gun Club, the evidence presented did indicate a number of means by which defendant might possibly reduce its noise to acceptable levels. Such methods include, in Mr. Perez's words:

"Lots of barriers, depressed usage, the number of shots could be reduced, hours of operations could be reduced, curfews as far as time of day in which it is used, or days of the week in which it is used. There are many ways in which you can make a source be much better soundwise. Another area that had been discussed with me a number of times by the citizens was the objection to individuals loading their own shells and putting more powder than there should be, etc. The gun club could specify tight limitations on the shot used. If necessary, they might even think in terms of not allowing private shells, you know, just store purchased shells which might have better quality control. Many, many areas could be investigated."

Although sound barriers may be effective only in their immediate vicinity, distance itself will help muffle the sound of gunfire for more remote areas. In any event, no reason appears that would justify precluding the Gun Club from attempting to meet applicable noise standards. The problem is that no standards have been set.

In any event, the Environmental Rights Act does not envision a mechanical implementation of the worthwhile goal of preserving our environment. Instead, as the majority acknowledges, the act vests courts with discretion to balance in each case the value of protecting our natural resources against the competing social values that may be present. In this respect, decisions under the act are not unlike traditional nuisance cases, but with the difference that the act instructs us as to the greater weight to be given environmental values. In the instant case, it appears that the competing interests can be reconciled by permitting the Gun Club to operate under noise restrictions. The remedy employed by the district court is uncharacteristic of equitable relief, for it uncompromisingly inflicts unnecessary hardship upon defendant. I cannot concur with its validity in these circumstances. Some temporary standards should be set by the court until valid standards are adopted by the PCA.

Much the same analysis is applicable to the court's finding that the lead shot from

---

2. Dr. Stephen Chapman, for example, testified to the disturbing presence of the Bald Eagle Sportsmen's Association, which features an outdoor rile range: " * * * There's been an occasion in the past when they shot bazookas out there. That shook the house completely."

3. One local resident testified that the noise from the Gun Club was equivalent in volume to her children shooting in the backyard. She lived 1½ miles from the Gun Club.

4. The standards will vary of course with the context of the sound source. Minn.St. 116.07, subd. 2. Other states have apparently adopted a wide range of noise standards: e. g., Illinois (50 decibels by day, 45 by night) and New York (100 decibels by day).

spent shells is an enjoinable pollutant. Lead shot presents harm to this environment in two respects: First, by being ingested by waterfowl and, second, by leaching into the waters of Rice Lake. The evidence is conflicting in both respects. Residents contradicted one another as to whether ducks had been seen feeding in the boggy northern part of the Gun Club property. The expert witnesses for plaintiffs largely assumed that the area was one in which ducks would feed. I believe that a fair appraisal of all testimony would indicate that feeding by ducks in the areas of lead deposits would be insignificant. Similarly, possible leaching of the lead shot pitted plaintiffs' experts against the Rice Creek Watershed District, the city of Hugo's environmental assessment of the Gun Club, and the amount of leaching that occurred at the prior site of the Gun Club over a 30-year period.[5] A fair appraisal of this testimony would indicate that leaching would be within acceptable standards. Given the toxicity of lead, however, I would hesitate to hold the court's findings clearly erroneous. But even so, an unconditional permanent injunction against ill-fits the circumstances. Employment of steel shot or the periodic recapture of lead shot would seem a more appropriate remedy to accommodate the opposing interests.[6]

I do not intend to denigrate in any fashion the tranquility and natural wonders Rice Lake and the surrounding wetlands offer. But in our pursuit of environmental sanctuary, we cannot forget the identity of the supplicants—individuals, each with impenetrably different values and outlooks. And when these values conflict, as is likely when differing land uses are in proximity, a balancing of carefully weighed interests must occur. Here, the injunction granted by the district court secured environmental

protection at unnecessary hardship to defendant. I would not enjoin the Gun Club's operation unless and until (1) the trial court first sets temporary standards for noise and the Gun Club is given a reasonable opportunity to meet those standards and fails to do so, or valid PCA noise standards are adopted for the area and the Gun Club fails to meet them; and (2) the Gun Club is given a reasonable opportunity to present a plan acceptable to the PCA to periodically recover lead shot. Nor should an injunction be issued if the Gun Club can meet suitable standards for noise and agrees to require users of its facilities to use steel shot in shot guns in lieu of lead shot.

SCOTT, Justice (dissenting).

I join in the dissent of Mr. Justice TODD.

---

5. It must be noted that the state according to news media is proposing banning the firing of 12-gauge lead shot within 150 yards of a body of water. The Gun Club property is 3 times that distance from Rice Lake.

6. The majority suggests that recapture of lead shot would be infeasible in this area. That seems a judgment more properly decided by the Gun Club, however, so long as the recovery

process itself does not materially adversely affect the lands north of its property. Whether every effort to recapture lead shot would pollute those lands was not determined by the judgment below. Presumably the land where the shot would fall would be used for farming or some other economic purpose if not used as Gun Club property.