STATE OF MINNESOTA

IN SUPREME COURT

A14-1131

Court of Appeals                                                    Dietzen, J.
                              Concurring in part and dissenting in part, Lillehaug, J.,
                                                    Gildea, C.J., Anderson, J.

Melrose Gates, LLC,

                    Respondent,

vs.                                                    Filed: February 17, 2016
                                                    Office of Appellate Courts

Chor Moua, et al.,

                    Appellants.

_____

Steven L. Theesfeld, Yost & Baill, LLP, Minneapolis, Minnesota, for respondent.

Mark K. Hellie, Rylee J. Retzer-Busselman, American Family Insurance, Eden Prairie, Minnesota, for appellants.

Darryn C. Beckstrom, Robert J. Olson, Lawrence R. McDonough, Dorsey & Whitney LLP, Minneapolis, Minnesota, for amicus curiae HOME Line, Inc.

_____

S Y L L A B U S

1.      When a district court grants summary judgment dismissing an equitable claim on the ground that, as a matter of law, the requirements for equitable relief were not met, and the record shows that the facts were undisputed and the district court did not weigh equitable factors, an appellate court reviews the district court's decision de novo.

1

2. Under the factors set forth in *RAM Mutual Insurance Co. v. Rohde*, 820 N.W.2d 1 (Minn. 2012), the landlord can proceed on a subrogation claim for damage to the tenants' own apartment, but not for damage to other property belonging to the landlord.

Affirmed in part, reversed in part, and remanded.

O P I N I O N

DIETZEN, Justice.

In this case, we revisit the applicability of equitable subrogation to parties in a landlord-tenant relationship. Respondent Melrose Gates, LLC (Landlord) leased an apartment to appellants Chor Moua and Maisse Xiong (Tenants). The apartment building in which Tenants lived was damaged by a fire. Landlord's insurer paid for the repairs to the building, and then the insurer brought a subrogation action in the name of Landlord against Tenants to recover the money the insurer paid to repair the building. The district court relied on our decision in *RAM Mutual Insurance Co. v. Rohde*, 820 N.W.2d 1 (Minn. 2012), to grant summary judgment to Tenants, concluding that Landlord may not maintain a subrogation action in these circumstances. The court of appeals reversed and remanded, reasoning that the lease agreement clearly reflected the parties' expectation that Tenants would be liable. For the reasons set forth below, we conclude that the Landlord can proceed on a subrogation claim against Tenants for damage they caused to their own apartment, but not for damage to other property belonging to Landlord. We therefore affirm the decision of the court of appeals in part, reverse in part, and remand for further proceedings consistent with this opinion.

I.

Landlord owns a residential rental property in Brooklyn Center consisting of approximately 36 units. Landlord leased apartment 311 to Tenants for an initial rental period running from November 1, 2008 to April 30, 2009. Thereafter the lease agreement was extended under its original terms on a month-to-month basis.

Under the written lease, Tenants were required to pay rent of $800 per month, and to provide a security deposit of $759. The lease included blank lines that the parties filled in for the street address of the premises and the apartment number. The lease covered a variety of topics, including liability for damage to the leased property.

On June 2, 2012, Tenants' apartment and a neighboring apartment were damaged by a fire. For purposes of this appeal, the parties agree that the fire was caused by Tenants' negligence. Landlord had an insurance policy for the entire complex with coverage of approximately $19 million. Landlord's insurer, State Farm Fire and Casualty Company, paid approximately $470,000 for repairs to the building.

Tenants had a renter's insurance policy with American Family Insurance with limits of approximately $20,000 in personal property coverage and $300,000 in personal liability coverage. In November 2013, State Farm brought this subrogation action against Tenants to recover the money it had paid to repair the damage caused by the fire.

The parties filed cross-motions for summary judgment. The district court granted Tenants' motion and dismissed the subrogation action with prejudice. Applying the factors we articulated in *RAM Mutual Insurance Co. v. Rohde*, 820 N.W.2d 1, 14-16

(Minn. 2012), the court determined that the parties did not reasonably expect that Tenants would be liable for these losses.

Landlord appealed,[1] and the court of appeals reversed and remanded. *Melrose Gates, LLC v. Moua*, No. A14-1131, 2015 WL 1608845, at \*4 (Minn. App. Apr. 13, 2015). Like the district court, the court of appeals applied our decision in *RAM* to determine whether a subrogation action was available. 2015 WL 1608845, at \*3-4. Unlike the district court, the court of appeals determined that the parties reasonably would have expected that Tenants would be liable in a subrogation action for the damage they caused. *Id.* at \*4. Applying a de novo standard of review, the court of appeals concluded that the lease "unambiguously provides" that Tenants would reimburse Landlord for any damage caused by their negligence, that no other provision of the lease calls that unambiguous provision into question, and that the parties' intentions were therefore discernible from the language of the lease itself. *Id.*

## II.

Tenants argue that the court of appeals misapplied our decision in *RAM Mutual Insurance Co. v. Rohde*, 820 N.W.2d 1 (Minn. 2012), to the facts of this case. As a threshold matter, the parties dispute whether our standard of review of the district court's decision is de novo or for an abuse of discretion. The parties also dispute whether the insurer may maintain a subrogation action against the negligent tenants in this case.

---

[1] In fact, State Farm appealed, asserting Landlord's rights against Tenants. For simplicity, throughout the remainder of this opinion we will refer to the acts and arguments of State Farm, asserting Landlord's claims against Tenants in this litigation, simply as the acts and arguments of Landlord.

4

Because the law with respect to subrogation and the standard of review are intertwined, we will first discuss the relevant subrogation law before addressing the standard of review.

A.

Subrogation is the substitution of one party for another whose debt the party pays, which entitles the paying party to step into the shoes, or be substituted to all the rights, priorities, remedies, liens, and securities of, the other party. *RAM*, 820 N.W.2d at 5 (citing 16 Lee R. Russ & Thomas F. Segalla, *Couch on Insurance* § 222:5 (3d ed. 1995)); *see also Black's Law Dictionary* 1654-55 (10th ed. 2014).

Generally, there are two types of subrogation: equitable and conventional. *Medica, Inc. v. Atl. Mut. Ins. Co.*, 566 N.W.2d 74, 77 (Minn. 1997). Equitable subrogation has its origins in common law, and its purpose is to place the responsibility for the payment of the debt upon the one who in equity ought to pay it. *Id.* (citing *Westendorf ex rel. Westendorf v. Stasson*, 330 N.W.2d 699, 703 (Minn. 1983)). Conventional subrogation is contractual and springs from the agreement between the insured and the insurer. *Id.* Under conventional subrogation, the parties may grant greater subrogation rights under the contract than would be recognized in equity. *Id.* (citing 16 George J. Couch, *Couch on Insurance 2d* § 61:3 (rev. ed. 1983)). But even under conventional subrogation, the terms of subrogation are governed by equitable principles unless the contract clearly and explicitly provides to the contrary. *Id.* (citing *Westendorf*, 330 N.W.2d at 703).

Subrogation in the context of insurance is "the substitution of an insurer (subrogee) to the rights of the insured (subrogor)." *RAM,* 820 N.W.2d at 5 (quoting *Medica, Inc.*, 566 N.W.2d at 76). Put differently, when an insurer has paid a loss, "the insurer is subrogated in a corresponding amount to the insured's right of action against any third party whose wrongful conduct caused the loss." *Id.* at 5-6. In this case, State Farm paid Landlord's costs to repair the apartment building and therefore seeks compensation in that amount under Landlord's right of action against Tenants.

To determine whether an insurer may maintain a subrogation action against the insured's negligent tenant, this court has adopted a case-by-case approach. *Id.* at 11-12. In doing so, we rejected the approach taken by the court of appeals in *United Fire & Casualty Co. v. Bruggeman*, 505 N.W.2d 87, 88-90 (Minn. App. 1993), *rev. denied* (Minn. Oct. 19, 1993), which had adopted a rule that "barr[ed] insurers from pursuing subrogation claims against negligent tenants in the absence of an express agreement to the contrary." *RAM*, 820 N.W.2d at 11. Instead, we reasoned that a subrogation action is grounded in the contractual relationship between the landlord and the tenant, as well as the contractual relationship between the insurer and the insured, and therefore a rule that is defined by the respective contracts is superior to one that makes legal assumptions that do not comport with the reasonable expectations of the parties to the contract. *Id.* at 12. Moreover, the case-by-case approach best effectuates the intentions of the parties while taking into account equitable considerations. *Id.* at 12-13. Finally, the case-by-case approach "is more consistent with Minnesota's public policy of holding tortfeasors accountable for their actions." *Id.* at 13.

In *RAM* we also provided several principles to guide a district court's determination of which party bears financial responsibility for a particular loss. We stated that the analysis "begins with the written documents executed by the parties." *Id.* at 14. The lease agreement is a contract, which the court should interpret to determine whether it addresses the allocation of liability for a particular loss. *See id.* The lease itself may "indicat[e] which party agreed to bear the risk of loss for a particular type of damage." *Id.* at 15. For example, if the landlord were obligated to procure insurance governing a particular type of loss, such an obligation would be evidence that the insurer would not be able to maintain a subrogation action against the tenant. *Id.* But if the tenant were obligated to procure insurance covering a particular type of loss, that would be evidence that the tenant would be liable for that particular loss. *Id.*

Significantly, we observed that "[o]ften a court will be able to determine the expectations of the parties from the language of the lease itself." *Id.* But we also noted that the court may consider "other admissible evidence shedding light on the expectations of the parties," such as the types and amounts of insurance actually purchased by the parties. *Id.* (quoting *Rausch v. Allstate Ins. Co.*, 882 A.2d 801, 814 (Md. 2005)). Finally, we stated that the court may consider principles of equity and good conscience, such as whether the lease is a contract of adhesion, whether the lease provisions allocating responsibility are unfair and in violation of public policy, and whether "the leased premises are part of a large multi-unit structure." *Id.* at 16.

B.

With these principles in mind we return to the question of the applicable standard of review. The case comes to us on review of the district court's grant of summary judgment. When we review a grant of summary judgment, we must consider whether there are any genuine issues of material fact and whether the district court erred in its application of the law. *Leamington Co. v. Nonprofits' Ins. Ass'n*, 615 N.W.2d 349, 353 (Minn. 2000). In a typical case, when the material facts are not in dispute, an appellate court will review the district court's grant of summary judgment de novo. *See Medica, Inc.*, 566 N.W.2d at 76. The court of appeals applied that standard below, and Landlord argues that we should do so as well.

Tenants, however, argue that the de novo standard of review is inappropriate in this case because the district court weighed equitable factors. As we have recognized, "[t]he doctrine of subrogation is of purely equitable origin and nature." *N. Trust Co. v. Consol. Elevator Co.*, 142 Minn. 132, 138, 171 N.W. 265, 268 (1919). Ordinarily, this court "review[s] a district court's decision to award equitable relief . . . for abuse of discretion." *Dakota Cty. HRA v. Blackwell*, 602 N.W.2d 243, 244 (Minn. 1999).

Generally, litigants have no right to a jury trial on the merits of equitable claims, and traditionally the judge serves as the trier of fact for such claims. *United Prairie Bank-Mountain Lake v. Haugen Nutrition & Equip., LLC*, 813 N.W.2d 49, 54 (Minn. 2012) (stating that the right to a jury trial extends only to actions at law, not actions in equity); *Raymond Farmers Elevator Co. v. Am. Sur. Co. of N.Y.*, 207 Minn. 117, 119, 290 N.W. 231, 233 (1940) (holding that there was no error when the court discharged the jury

and determined equitable claims). We give deference to a district court's equitable determinations because the court acts like a fact-finder, weighing all relevant factors and considering the unique facts of each case. *See Krmpotich v. City of Duluth*, 483 N.W.2d 55, 57 (Minn. 1992) (applying an abuse of discretion standard to a claim under the Environmental Rights Act "where the trial court weigh[ed] the equities in a balancing test 'analogous to the one traditionally employed by courts of equity' " (quoting *Minn. Pub. Interest Research Grp. v. White Bear Rod & Gun Club*, 257 N.W.2d 762, 782 (Minn. 1977))). In such circumstances, our deference is supported in large part by a conclusion that the district court is in the best position to analyze the facts and balance the relevant factors.

Our recent decisions have taken differing approaches to resolving the conflict between the de novo standard of review applicable to a district court's decision granting or denying summary judgment when the facts are not in dispute, on the one hand, and the abuse of discretion standard applicable to a district court's decision whether to grant equitable relief, on the other.[2] In *Medica, Inc.*, we addressed the question whether a

---

[2] The dissent cites to numerous cases in which this court, the court of appeals, and the federal courts have referenced the discretionary nature of equitable determinations. But with only two exceptions, those cases did not involve the situation presented in this case, in which the district court determined cross-motions for summary judgment, based on undisputed facts, when equitable relief was sought. *See Christopher Phelps & Assocs., LLC v. Galloway*, 492 F.3d 532, 546 (4th Cir. 2007) (holding that the decision whether to grant an injunction, following a jury trial, was within the discretion of the trial court); *Kansas City S. Transport Co. v. Teamster Local Union 41*, 126 F.3d 1059, 1063 (8th Cir. 1997) (reviewing grant of preliminary injunction for abuse of discretion); *Grossbaum v. Indianapolis-Marion Cty. Bldg. Auth.*, 100 F.3d 1287, 1292 (7th Cir. 1996) (reviewing the denial of a preliminary injunction for an abuse of discretion); *City of*

(Footnote continued on next page.)

9

health maintenance organization has subrogation rights against an insurer that issued a general liability policy. 566 N.W.2d at 77-78. The district court had granted summary judgment to the general liability insurer, holding that the HMO had no such subrogation rights on either a contractual or an equitable theory. *Id.* at 76. We stated that "[b]ecause the parties do not dispute the relevant facts, a *de novo* standard of review is applied to determine whether the district court erred in its application of the law." *Id.* Although we recognized that "even when the right to subrogation is contractual, the terms of the subrogation will be governed by equitable principles," *id.* at 77, we did not consider whether the equitable nature of subrogation would affect the standard of review.

---

(Footnote continued from previous page.)
*North Oaks v. Sarpal*, 797 N.W.2d 18, 24 (Minn. 2011) (holding "that a district court's conclusion on equitable estoppel after a bench trial is reviewed for abuse of discretion."); *Dakota Cty. HRA v. Blackwell*, 602 N.W.2d 243, 244 (Minn. 1999) (applying an abuse of discretion standard to a grant of specific performance following a court trial); *Krmpotich*, 483 N.W.2d at 57 (reviewing a trial court's weighing of equitable factors following a bench trial for abuse of discretion); *Flynn v. Sawyer*, 272 N.W.2d 904, 910 (Minn. 1978) (applying an abuse of discretion standard of review to a trial court's decision, following trial, to grant specific performance of a contract); *AMF Pinspotters, Inc. v. Harkins Bowling, Inc.*, 260 Minn. 499, 504, 110 N.W.2d 348, 351 (1961) (reviewing the grant of a temporary injunction under an abuse of discretion standard).

Moreover, in the exceptional cases in which the courts *have* faced a posture similar to this case, they have applied de novo review. *See Minn. Laborers Health & Welfare Fund v. Granite Re, Inc.*, 844 N.W.2d 509, 513 (Minn. 2014) (applying de novo review when the district court made a decision on summary judgment on "a purely legal question" bearing on whether equitable relief was available); *Brown v. Lee*, 859 N.W.2d 836, 839 (Minn. App. 2015), *rev. denied* (Minn. May 19, 2015) (declining to apply a "more deferential standard of review" when a district court "without balancing the equities . . . concluded" that a party was not entitled to equitable relief "as a matter of law").

10

In *Citizens State Bank v. Raven Trading Partners, Inc.*, 786 N.W.2d 274 (Minn. 2010), we considered the application of principles of equitable subrogation in the mortgage-payment context. There, a borrower applied the proceeds of a loan to the balance due on prior mortgages on real property. *Id.* at 276. The district court granted summary judgment to the lender, holding that the lender was equitably subrogated to the priority positions of the two prior mortgagees. *Id.* at 276-77. We "note[d] that the question of the proper standard of review for a district court's decision on a motion for summary judgment regarding the applicability of equitable subrogation is not clearly settled in Minnesota," and specifically that "[n]one of our previous cases analyzing the applicability of equitable subrogation involving the priority of mortgages discussed the applicable standard of review when there are cross-motions for summary judgment." *Id.* at 277 n.2. We applied an abuse of discretion standard to review the district court's decision, *id.* at 277, but stated that "we need not decide the proper standard of review because we would reach the same result" under either an abuse of discretion standard or "under our normal review on appeal from summary judgment," *id.* at 278 n.2.

In *SCI Minnesota Funeral Services, Inc. v. Washburn-McReavy Funeral Corp.*, 795 N.W.2d 855 (Minn. 2011), we considered whether the parties to a stock sale transaction were entitled to reformation or rescission of the transaction based on mutual mistake. The district court granted summary judgment to the defendants, holding that the evidence did not satisfy the elements required for reformation and that there was no mutual mistake. *Id.* at 859. We analyzed "the proper standard of review that applies to the review of a grant of summary judgment involving claims for equitable relief" and

11

concluded that a de novo standard applied. *Id.* at 860. We acknowledged that "[a] deferential standard of review might be applicable where, after balancing the equities, the district court determines not to award equitable relief," *id.*, but where "the district court ruled as a matter of law that the requirements for rescission and reformation were not met" and the court also "ruled based on undisputed facts . . . in response to the parties' cross-motions for summary judgment," the de novo standard of review "does not change simply because the claims at issue are for equitable relief," *id.* at 861.

In *RAM*, we addressed substantially the same issue that we address here: whether an insurer was entitled to be subrogated to the insured landlord's claims against a tenant. 820 N.W.2d at 4. As discussed above, the district court rejected the subrogation claim as a matter of law, ruling that an insurer could *never* be subrogated to a landlord's claims against a tenant under the court of appeals' decision in *Bruggeman*, 505 N.W.2d 87. *See* 820 N.W.2d at 4. We stated:

> While subrogation is an equitable remedy, a standard of review more deferential than de novo, which may be applicable on appeal from summary judgment "where, after balancing the equities, the district court determines not to award equitable relief," is not applicable here where the district court determined as a matter of law that RAM could not maintain a subrogation action.

820 N.W.2d at 6 n.3 (quoting *SCI*, 795 N.W.2d at 860-61).[3]

---

[3]     In *Caldas v. Affordable Granite & Stone, Inc.*, 820 N.W.2d 826 (Minn. 2012), we reviewed the district court's dismissal on summary judgment of plaintiffs' employee wage claims, including an equitable claim for unjust enrichment. We reviewed the dismissal of plaintiffs' contractual and statutory claims under our typical summary judgment standard. *Id.* at 831-32. In reviewing the dismissal of the unjust enrichment claim, we cited our decisions in *SCI* and *Citizens State Bank* before concluding that

(Footnote continued on next page.)

Applying the principles from these precedents, we conclude that the posture of this case most closely resembles that presented in our decisions in *SCI* and *RAM*. As in *SCI*, the district court in this case made its decision based on the parties' cross-motions for summary judgment, a posture in which the parties implicitly, if not actually, agree that there is no dispute as to the material facts. *See SCI*, 795 N.W.2d at 861. Indeed, in this case the relevant facts are undisputed by the parties. Also in *SCI*, as here, "the district court ruled as a matter of law the requirements for" an equitable remedy "were not met." *Id.*; *see also RAM*, 820 N.W.2d at 6 n.3 (stating that an abuse of discretion standard "is not applicable here where the district court determined as a matter of law that RAM could not maintain a subrogation action").

A close examination of the district court's opinion reveals that its treatment of equitable principles does not justify a deferential standard of review. Initially, we note that although the district court stated that it was "balanc[ing] 'the principles of equity and good conscience,' " in fact the court considered only one such principle, namely "whether the leased area is part of a multi-unit complex." There is no indication in the district court's order or the accompanying memorandum that the court considered counterbalancing factors and weighed them to reach a resolution of the particular issue before it. Nor, for that matter, did the district court base its decision on specific facts

(Footnote continued from previous page.)
because "the claim fails under either a de novo or the more deferential abuse of discretion standard, we decline to resolve the standard of review question in this case." 820 N.W.2d at 838.

relevant to the parties to this case. Instead, it simply took our general reasoning in *RAM* about the nature of multi-unit structures and applied it, as a matter of law, to Landlord and Tenants in this case.

We conclude that the district court's treatment of equitable principles in this case demonstrates that it neither weighed the equities, nor made its decision based on factual findings that it was uniquely well-suited to make. Instead, the court decided the parties' cross-motions for summary judgment on the basis that "as a matter of law the requirements for [subrogation] were not met." *SCI*, 795 N.W.2d at 861. Under such circumstances, where the lease is clear, the facts are undisputed, and the district court grants judgment as a matter of law, de novo review of the district court's conclusions is appropriate. *Id.*

C.

We turn now to the merits of the district court's decision. Here our task is to determine the expectations of the parties to the contract as to which party bears responsibility for the loss. *RAM*, 820 N.W.2d at 14. Under *RAM*, we first interpret the language of the lease. *Id.* The provisions of a lease are interpreted in the context of the entire agreement. *Id.* (citing *Hydra-Mac, Inc. v. Onan Corp.*, 450 N.W.2d 913, 916 (Minn. 1990)). When the language of a lease is unambiguous, we give the words their plain and ordinary meaning. *Id.* at 14-15 (citing *Metro. Airports Comm'n v. Noble*, 763 N.W.2d 639, 645 (Minn. 2009)). But if the language of a lease is ambiguous, it should be construed against the drafter. *Id.* at 15 (citing *Hilligoss v. Cargill, Inc.*, 649 N.W.2d 142, 148 (Minn. 2002)).

14

The portion of the lease that discusses liability of the Tenants is contained in section F, which is entitled "LIABILITY OF RESIDENT AND MANAGEMENT."[4] Paragraph 27 of section F provides as follows:

> 27. RESIDENT SHALL REIMBURSE MANAGEMENT FOR: 1) Any loss, property damage, or cost of repair or service (including plumbing problems) caused by negligence or improper use by RESIDENT, his/her agents, family or guests; 2) any loss or damage caused by doors or windows being left open; 3) all costs MANAGEMENT has because of abandonment of the Apartment or other violations of the Lease by RESIDENT, such as costs for advertising the Apartment; 4) all court costs and attorney's fees MANAGEMENT has in any suit for eviction, unpaid rent, or any other debt or charge.

The district court concluded that paragraph 27 did not specifically "allocate the risk of loss such as that caused by fire" and therefore did "not show that the parties intended or reasonably expected that [Tenants] would be liable for these losses." The court of appeals interpreted the language of the lease broadly, concluding that Tenants agreed to reimburse Landlord for any damage caused by their negligence. *Melrose Gates*, 2015 WL 1608845, at *4.

The district court's interpretation ignores the plain language of the lease. Paragraph 27 plainly states that Tenants shall reimburse Landlord for "*[a]ny* loss, property damage, or cost of repair or service (including plumbing problems) caused by negligence or improper use by [Tenant], his/her agents, family or guests" (emphasis added). The scope of paragraph 27 is very broad and encompasses "any loss." The word

---

[4] Although we refer to respondent as "Landlord" and appellants as "Tenants," the lease the parties signed used the terms "Management" and "Resident," respectively. The difference in nomenclature does not affect our reasoning.

15

"any" in this context is without limitation and unambiguously refers to all losses including loss by fire. *See The American Heritage Dictionary* 81 (5th ed. 2011) (defining "any" in relevant part as "[o]ne, some, every, or all without specification"). It clearly demonstrates that the parties anticipated that Tenants would bear responsibility for damages from a fire loss caused by their negligence.

But our interpretation of paragraph 27 does not end our inquiry. Landlord argues that Tenants' liability under paragraph 27 extends to the entire building. To address this argument, we return to the language of the lease. Based upon our review of the entire lease agreement, we cannot conclude that paragraph 27 unambiguously applies to damage caused by Tenants outside of the leased premises. Instead, we interpret paragraph 27 to apply only to damage caused by Tenants to the "Apartment" as that term is defined in the lease, namely as apartment 311 itself, exclusive of any other apartments or common areas.

Initially, we note that the vast majority of the parties' obligations are connected to the Apartment rather than to the apartment building in general. For example, paragraph 5 governs who may live in the Apartment.[5] Tenants' promises in paragraph 7 are mostly related to the use of the Apartment, but that paragraph also contains promises regarding

---

[5] 5. OCCUPANCY AND USE: Only the persons listed above as RESIDENTS may live in the Apartment. Persons not listed as RESIDENTS may live in the Apartment only with the prior written consent of MANAGEMENT. RESIDENTS may use the Apartment and utilities for normal residential purposes only.

16

locations "near" the Apartment as well as "common areas" and the "area surrounding the building."[6]

The parties' promises regarding damage are even more tightly bound up with the Apartment. To be sure, in paragraph 10 *Landlord* promises to keep common areas, as well as the Apartment, in appropriate condition.[7] But paragraph 11 contains no promises on behalf of *Tenants* that extend outside the Apartment; they promise only to keep the Apartment in good, clean condition and not to alter it, and that when they leave "the

---

[6]    7. RESIDENT PROMISES: . . . 2) to use the Apartment only as a private residence, and not to engage in any activity or allow any condition that is illegal or dangerous or which would cause a cancellation, restriction or increase in premium in MANAGEMENT'S insurance; 3) not to use or store on or near the Apartment any flammable, toxic, hazardous, or explosive substance; 4) not to interfere in the management and operation of the Apartment building; . . . 6) that the Apartment, common areas, or area surrounding the building will not be used by the RESIDENT, any member of the RESIDENT'S household, any guest of the RESIDENT, or by anyone acting under his/her control to manufacture, sell, give away, barter, deliver, exchange, distribute, possess or use any illegal drugs; or to engage in prostitution or any prostitution related activity; or to unlawfully use or possess any firearm; or to allow any stolen property on the premises.

[7]    10. MANAGEMENT PROMISES: 1) That the Apartment and all common areas are fit for use as residential premises; 2) to keep the Apartment in reasonable repair and make necessary repairs within a reasonable time after written notice by RESIDENT except when damage is caused by the intentional or negligent conduct of the RESIDENT or his/her guests; 3) to maintain the Apartment in compliance with applicable health and safety codes except when a violation of the health and safety codes has been caused by the intentional or negligent conduct of the RESIDENT or his/her guests; 4) to keep the common areas clean and in good condition.

17

Apartment will be left in good condition, except for ordinary wear and tear."[8]  Similarly, paragraph 12 allows Landlord to keep "all or part of the security deposit . . . for damage to the Apartment beyond ordinary wear and tear"; it says nothing explicitly authorizing Landlord to use the security deposit for damage caused by Tenants to other units or common areas.

When viewed in this light, the reference in paragraph 27 to "[a]ny loss, property damage, or cost of repair or service (including plumbing problems) caused by negligence or improper use by" Tenants or their agents, family, or guests, is best understood as referring to loss, property damage, or cost of repair or service with respect to *the Apartment*.  The term  "improper use" references Tenants' earlier promises in paragraph 7 to use the Apartment, rather than other units, appropriately; and the terms "loss, property damage, or cost of repair or service" most naturally reference Tenants' promises in paragraph 11 not to "damage the Apartment"; not to "paint or wallpaper the Apartment, or make any structural change in the Apartment"; to "keep the Apartment

---

[8]    11. RESIDENT PROMISES: 1) Not to damage or misuse the Apartment or waste the utilities provided by MANAGEMENT or allow his/her guests to do so; 2) not to paint or wallpaper the Apartment, or make any structural changes in the Apartment without the prior written consent of MANAGEMENT; 3) to keep the Apartment clean, and in compliance with all health and safety codes; 4) to give written notice to MANAGEMENT of any necessary repairs to be made; 5) to notify MANAGEMENT immediately of any conditions in the Apartment that are dangerous to human health or safety, or which may damage the Apartment or waste utilities provided by MANAGEMENT; 6) that when RESIDENT moves out, the Apartment will be left in good condition, except for ordinary wear and tear . . . .

18

clean, and in compliance with all health and safety codes"; and to leave "the Apartment . . . in good condition."

This interpretation is consistent with paragraph 12, which authorizes Landlord to use Tenants' security deposit "for damage to the Apartment beyond ordinary wear and tear": if Tenants had agreed to accept liability under the lease for damage they negligently caused to Landlord's property other than the Apartment, the lease might be expected to explicitly permit the security deposit to be used to cover such damage. Furthermore, this interpretation of Tenants' liability under paragraph 27 gains support from our observation in *RAM* that "in the absence of a 'very clear contractual obligation to the contrary, the tenant likely is not thinking beyond the leased premises.' " 820 N.W.2d at 16 (quoting *Rausch*, 882 A.2d at 816). At the very least, the lease is ambiguous as to whether paragraph 27 is applicable to damage caused by Tenants to property other than the Apartment. And construing the ambiguity against Landlord,[9] we conclude that paragraph 27 is limited to loss and damage to the Apartment.

No other provision of the lease draws this interpretation into question. For example, paragraph 25 absolves Landlord of liability for damage done to Tenants, their guests, or their property "that was not caused by" Landlord, and recommends that

---

[9] Although the form lease in this case was prepared by the Minnesota Multi Housing Association, we nevertheless conclude that it is appropriate to construe the form lease, prepared for use by landlords and presented by Landlord to Tenants in this case, against Landlord as if it were the drafter. *Cf. DeJong v. Sioux Center, Iowa*, 168 F.3d 1115, 1121 (8th Cir. 1999) (construing ambiguities in form lease against party that presented lease).

19

Tenants "obtain Renter's insurance to protect against injuries or property damage."[10] The court of appeals interpreted these provisions as "reflect[ing] an intention that each party be responsible for damage caused by their actions." *Melrose Gates*, 2015 WL 1608845, at *4. We do not completely agree. To be sure, the statement that Landlord is not responsible for damages it did not cause does support that interpretation, if only slightly. But the recommendation that Tenants obtain renter's insurance "to protect against injuries or property damage," in a paragraph dealing with damage to Tenants, *their* guests, and *their* property, cannot be understood as a recommendation for Tenants to obtain insurance to cover damage to *Landlord's* property. In short, paragraph 25 neither strongly supports nor undermines any particular interpretation. Thus, the parties' lease, when taken as a whole, supports the conclusion that the parties reasonably expected that Tenants would be responsible for damage caused by them to the leased premises—that is, to the Apartment—but not for damage they negligently cause to other property of Landlord.

The remaining factors identified in *RAM* also support our conclusion. *See* 820 N.W.2d at 15-16. One such factor is "the types of insurance purchased by each party as evidence of each party's expectations with respect to its responsibility for particular

---

[10]    25. DAMAGE OR INJURY TO RESIDENT OR HIS/HER PROPERTY: MANAGEMENT is not responsible for any damage or injury that is done to RESIDENT or his/her property, guests or their property that was not caused by MANAGEMENT. MANAGEMENT recommend that RESIDENT obtain Renter's insurance to protect against injuries or property damage.

losses." *Id.* at 15. Landlord took out an insurance policy on the entire apartment complex with coverage of approximately $19 million, whereas Tenants' renters' insurance policy was limited to $300,000 in personal liability coverage. The district court concluded that this discrepancy indicated that the parties could not have expected Tenants to be liable for claims to Landlord or its insurer, a conclusion that the court of appeals rejected based on its view that Tenants "require far less coverage." *Melrose Gates*, 2015 WL 1608845, at *4. But Tenants require less coverage only if their liability is limited to damage they cause to their own apartment. If Tenants are instead liable on literally *any* subrogation claim, as they would be under the court of appeals' holding, then they might face liability for the entire complex far in excess of their coverage. And equitable considerations, including the fact that Tenants' apartment was part of a large multi-unit structure, add further support to our conclusion.[11]

Finally, Tenants allege that because *Bruggeman* had not yet been overruled at the time they entered into their lease (and was therefore the governing law in Minnesota), the parties could not reasonably have expected that Tenants would be liable for subrogation claims at all. We disagree. Although *Bruggeman* was the governing law at the time, we doubt that the parties could have formed firm expectations about subrogation without definitive authority from this court. Further, in *RAM* we set forth the relevant factors for the court to consider in determining the intent of the parties. We did not mention this

---

[11] The other equitable consideration we mentioned in *RAM* was "whether the lease is a contract of adhesion." 820 N.W.2d at 16. Tenants do not argue that their lease was a contract of adhesion.

21

factor*, and that omission could not have been accidental, because this factor would have been significant in that case. *See RAM*, 820 N.W.2d at 13 (stating that the district court erroneously relied on *Bruggeman*, which was good law at the time). Tenants' contention is therefore inconsistent with our opinion in *RAM*.

III.

We hold that when a district court grants summary judgment dismissing an equitable claim on the ground that, as a matter of law, the requirements for equitable relief were not met, and the record shows that the facts were undisputed and the district court did not weigh equitable factors, an appellate court reviews the district court's decision de novo. Accordingly, we affirm the court of appeals with respect to the standard of review.

We further hold that under the factors set forth in *RAM Mutual Insurance Co. v. Rohde*, 820 N.W.2d 1, 14-16 (Minn. 2012), the lease clearly provided that Tenants are liable for negligence that results in damage to the leased premises, and there is no other language in the lease that changes the expectation of Tenants' liability. It is reasonable and fair that Tenants should be liable for negligence they cause to the leased premises. The other factors identified in *RAM* do not change our conclusion. Because we conclude that the parties would reasonably have expected that Tenants would be liable for damage they caused to their own apartment, but not to other property belonging to Landlord, we affirm the decision of the court of appeals in part, reverse in part, and remand to the district court for further proceedings consistent with this opinion.

Affirmed in part, reversed in part, and remanded.

CONCURRENCE & DISSENT

LILLEHAUG, Justice (concurring in part, dissenting in part).

In this case, the district court decided whether a subrogation claim based on equity was, indeed, equitable and should be maintained. In so deciding, the district court applied the undisputed facts to, weighed, and balanced the equitable factors identified in the controlling case of *RAM Mutual Insurance Co. v. Rohde*, 820 N.W.2d 1, 14-16 (Minn. 2012). The district court's decision that subrogation would not be equitable was a garden-variety exercise of sound judicial discretion. But, today, the majority subjects that discretionary, equitable decision to de novo review and arrives at a different conclusion. This unwarranted departure from our precedent is unsound. Therefore, I respectfully dissent in part.

I.

This case is about a subrogation claim. A fire in a three-story, 36-unit, building within the Melrose Gates apartment complex started on the balcony of apartment 311, the home of Chor Moua and Maisse Xiong (Tenants). The fire damaged both their apartment and, to a lesser extent, other property of Melrose Gates, LLC (Landlord).

Landlord's loss, including the damage to apartment 311, was covered by a $19 million insurance policy issued by State Farm Fire and Casualty Company (State Farm). State Farm paid Landlord $470,000 for the damage and then, stepping into the shoes of Landlord, sued Tenants seeking reimbursement for the full amount paid. Tenants had

$300,000 of renters insurance, leaving them personally exposed in the amount of at least $170,000.[1]

Both parties agreed that the equitable framework for deciding whether State Farm could maintain a subrogation claim against Tenants was established by our court in *RAM,* 820 N.W.2d at 14-16. *RAM* eschewed a black-letter rule in landlord-tenant subrogation cases, instead announcing an equitable, case-by-case determination based on whether the landlord and tenant "reasonably anticipated" that the tenant would be liable for tenant-caused property damage. *Id.* at 16. *RAM* identified several factors (*RAM* factors) for a court of equity to weigh and balance: the lease itself, the types of insurance each party purchased, and principles of equity and good conscience. *Id.* at 14-16.

In the district court, the parties filed cross motions for summary judgment regarding whether the Landlord and Tenants reasonably anticipated that Tenants would be liable for tenant-caused property loss and damage. The district court granted Tenants' motion for summary judgment and dismissed Landlord's complaint with prejudice. Applying the *RAM* factors, the court determined that the parties did not reasonably expect Tenants would be liable for these losses. *Id.* The district court determined that the lease did not allocate the risk of loss caused by fire and that it merely "*recommend*[*ed*]" that Tenants buy renters insurance. The court noted the disparity between Landlord's $19 million insurance policy and Tenants' $300,000 insurance policy, which covered

---

[1]     Tenants purchased a renters insurance policy providing $300,000 in personal-liability coverage. The personal-liability coverage included compensatory damages for bodily injury to a person injured on or off the premises. The policy also provided $20,200 in personal-property coverage.

Tenants' personal liability both on and off the premises. Regarding the principles of equity and good conscience, the district court considered the fact that Tenants, who rented only one unit of a multi-unit structure, likely could not have purchased an insurance policy intended to cover fire damage to the complex. The court also considered that when the parties entered into the lease, *United Fire & Casualty Co. v. Bruggeman*, 505 N.W.2d 87 (Minn. App. 1993), *rev. denied* (Minn. Oct. 19, 1993), which barred subrogation actions in the landlord-tenant context because tenants were considered co-insureds on the landlord's policy, was still good law. Weighing and balancing the *RAM* factors, the district court concluded that it would not be equitable to allow Landlord's insurer, through Landlord, to maintain a subrogation claim.

Applying a de novo standard of review, the court of appeals reversed and remanded. *Melrose Gates, LLC v. Moua*, No. A14-1131, 2015 WL 1608845 (Minn. Ct. App. Apr. 13, 2015). The court concluded that the lease was "unambiguous and put[] the tenant[s] on notice that [Landlord] would seek reimbursement for any damage resulting from the tenant[s'] negligence." Further, the $300,000 personal liability policy that Tenants carried supported the conclusion that the parties reasonably anticipated that Tenants would be liable on a subrogation claim, even though Tenants' coverage was significantly less than Landlord's. The court of appeals did not address whether "principles of equity and good conscience" weighed against permitting the subrogation claim, or the fact that when the parties entered into the lease no subrogation claim was cognizable under then-controlling precedent. Instead, the court concluded that the

C/D-3

parties' reasonable expectations could be determined from the plain language of the lease.

## II.

Subrogation is based on the principle "that no one should be enriched by another's loss," *Medica, Inc. v. Atl. Mut. Ins. Co.*, 566 N.W.2d 74, 77 (Minn. 1997) (quoting 6A John A. Appleman, *Insurance Law & Practice*, § 4054 at 143 (1972)). Subrogation "place[s] the charge where it ought to rest, by compelling the payment of the debt by him who ought in equity to pay it," *Westendorf ex rel. Westendorf v. Stasson*, 330 N.W.2d 699, 703 (Minn. 1983) (quoting *N. Trust Co. v. Consol. Elevator Co.*, 142 Minn. 132, 138, 171 N.W. 265, 268 (1919)). In this case the district court's task was to make an equitable determination on whether to allow subrogation.

Had the district court been making a purely legal determination based on undisputed facts, our review would be de novo. We "review legal decisions on summary judgment under a de novo standard," *SCI Minn. Funeral Servs., Inc. v. Washburn-McReavy Funeral Corp.*, 795 N.W.2d 855, 861 (Minn. 2011), and "view the evidence in the light most favorable to the party against whom judgment was granted," *Fabio v. Bellomo*, 504 N.W.2d 758, 761 (Minn. 1993). But, here the district court's decision based on a weighing and balancing of the *RAM* factors was not purely legal—it was equitable. Our standard of review of equitable decisions is well-established; it is for an abuse of discretion. "We review a district court's decision to award equitable relief . . . for abuse of discretion." *Dakota Cty. HRA v. Blackwell*, 602 N.W.2d 243, 244 (Minn. 1999); *see also Minn. Laborers Health & Welfare Fund v. Granite Re, Inc.*, 844 N.W.2d

509, 513 (Minn. 2014) (noting that fraudulent concealment is an equitable doctrine and, typically, a district court's decision as to whether to grant equitable relief is reviewed for an abuse of discretion); *City of North Oaks v. Sarpal*, 797 N.W.2d 18, 23 (Minn. 2011) (regarding equitable estoppel, "we review equitable determinations for abuse of discretion"); *Krmpotich v. City of Duluth*, 483 N.W.2d 55, 57 (Minn. 1992) ("[W]here the trial court weighs the equities in a balancing test . . . the appropriate standard of review is the abuse of discretion standard"); *Flynn v. Sawyer*, 272 N.W.2d 904, 910 (Minn. 1978) (holding that "[s]pecific performance is an equitable remedy addressed to the sound discretion of the trial court"); *AMF Pinspotters, Inc. v. Harkins Bowling, Inc.*, 260 Minn. 499, 504, 110 N.W.2d 348, 351 (1961) (reviewing a district court's grant of a temporary injunction under the abuse of discretion standard); *Brown v. Lee*, 859 N.W.2d 836, 839 (Minn. App. 2015), *rev. denied* (Minn. May 19, 2015) ("Because contribution is an equitable remedy, a more deferential standard of review than de novo may be applicable . . . .").[2]

In the same fashion, whether to allow a subrogation claim is an equitable decision that should be reviewed for an abuse of discretion. Because "[t]he doctrine of

---

[2]    Federal courts appear to agree. *See, e.g., Kansas City S. Transp. Co. v. Teamsters Local Union No. 41*, 126 F.3d 1059, 1063 (8th Cir. 1997) (review of an order granting a preliminary injunction is "for an abuse of discretion, clear legal error, and clearly erroneous fact findings") (quoting *Hill v. Xyquad, Inc.*, 939 F.2d 627, 630 (8th Cir. 1991)). *See also Christopher Phelps & Assocs., LLC v. Galloway*, 492 F.3d 532, 546 (4th Cir. 2007) ("Any relief granted in equity is at the discretion of the district court"); *Grossbaum v. Indianapolis-Marion Cty. Bldg. Auth.,* 100 F.3d 1287, 1292 (7th Cir. 1996) ("We review a trial court's discretionary balancing of factors under an abuse of discretion standard.").

subrogation is of purely equitable origin and nature," *N. Trust Co.*, 142 Minn. at 138, 171 N.W. at 268, the abuse of discretion standard is appropriate. For example, we applied this standard in *Citizens State Bank v. Raven Trading Partners, Inc.*, relative to the equitable subrogation of mortgages: "Where the material facts are not disputed, we review the district court's application of the law de novo . . . . [H]owever . . . '[g]ranting equitable relief is within the sound discretion of the trial court [and] [o]nly a clear abuse of that discretion will result in reversal.' " 786 N.W.2d 274, 277 (Minn. 2010) (alteration in original) (quoting *Nadeau v. Cty. of Ramsey*, 277 N.W.2d 520, 524 (Minn. 1979)).

The distinction between a *legal* decision on undisputed facts and an *equitable* decision on undisputed facts was drawn in *Caldas v. Affordable Granite & Stone, Inc.,* 820 N.W.2d 826 (Minn. 2012). We noted that, "when the relevant facts are undisputed the standard of review is de novo, but a more deferential abuse of discretion standard of review might be applicable where the district court, after balancing the equities, determines not to award equitable relief." *Id.* at 838 (citing *SCI Minn. Funeral Servs.*, 795 N.W.2d at 860; *Citizens State Bank*, 786 N.W.2d at 277 n.2). Although we did not resolve the standard of review in *Caldas*, the distinction between a *legal* determination on summary judgment and an *equitable* determination on summary judgment is a logical one consistent with our precedent.

Indeed, in the very opinion that established the case-by-case analytical framework we apply here, we indicated that a deferential standard of review "may be applicable 'where, after balancing the equities, the district court determines not to award equitable relief.' " *RAM*, 820 N.W.2d at 6 n.3 (quoting *SCI Minn. Funeral Servs.*, 795 N.W.2d at

860-61). *RAM* outlined the factors for the district court to consider when determining whether a subrogation claim may be maintained, including the lease itself, other admissible evidence, and principles of equity and good conscience. *Id.* at 14-16. In *RAM*, the district court's grant of a commercial tenant's motion for summary judgment was reviewed de novo only because the more deferential standard of review was "not applicable . . . where the district court determined as a matter of law that [the plaintiff] could not maintain a subrogation action." *Id.* at 6 n.3.

It only makes sense that an abuse of discretion standard applies when the district court weighs and balances the *RAM* factors, even on uncontested facts. As we said in *RAM*, "the case-by-case approach [to landlord-tenant subrogation] best effectuates the intent of the contracting parties *while still taking into account the equitable principles underlying subrogation* actions." *Id.* at 12 (emphasis added). In *RAM*, we encouraged the use of "basic principles of equity, which by definition require a court to weigh and balance the equities between the parties in determining whether subrogation is available in a particular case." *Id.* at 13. If the district court's role is to apply "principles of equity and good conscience," and then "weigh and balance" the *RAM* factors, that signifies considerable discretion—just as the district court has considerable discretion to weigh and balance the factors in any other equitable proceeding, whether for injunctive relief or otherwise.

The court asserts that, in this case, the district court did not weigh or balance the *RAM* factors. That is incorrect. To the contrary, the district court expressly referenced *RAM's* direction to perform a case-by-case balancing of factors, saying, "Courts must

also balance 'the principles of equity and good conscience' when determining whether to permit a subrogation claim." The district court did consider, weigh, and balance the *RAM* factors.

Therefore, the district court's equitable determination not to allow subrogation should be reviewed for an abuse of discretion. I see no such abuse here.

III.

The district court considered the following factors when it granted Tenants' summary judgment motion: 1) the terms of the lease; 2) the amount of insurance coverage each party carried; 3) the nature of the premises; and 4) the controlling Minnesota law at the time of the lease.

Correctly, the district court first considered the lease itself. *See RAM*, 820 N.W.2d at 14. It understood that, under *RAM*, "provisions of a lease should never be interpreted in isolation, but rather in the context of the entire agreement." *Id. (quoting Hydro-Mac, Inc. v. Onan Corp.*, 450 N.W.2d 913, 916 (Minn. 1990)).

Paragraph 27 in this lease states that "[Tenants] shall reimburse [landlord] for: 1) [a]ny loss, property damage, or cost of repair or service . . . caused by negligence or improper use by [Tenants] . . . ." Paragraph 11 provides Tenants' promise "1) not to damage . . . the Apartment. . . [and] 6) that when [Tenants] move[] out, the Apartment will be left in good condition, except for ordinary wear and tear." (Emphasis omitted.) The lease also reflects that each party will be responsible for damage caused by its actions. "[Landlord] is not responsible for any damage or injury that is done to [Tenants] or his/her property, guests or their property that was not caused by [Landlord]." Finally,

although the lease does not require Tenants to purchase insurance, it does "recommend[]" that Tenants obtain renters insurance.[3]

In this case, the district court noted that, although the lease "generally" states that Tenants may not damage the apartment and are responsible for losses they cause, the Lease does not allocate the risk of loss such as that caused by fire. The district court further noted that the lease merely recommended that Tenants purchase insurance. It concluded: "[t]aken as whole, the provisions of the Lease do not show that the parties intended or reasonably expected that [Tenants] would be liable for these losses." Thus the district court, in its equitable analysis, properly identified the relevant provisions in the lease and considered them as a whole. This is what we required in *RAM*.

Next, also as required by *RAM*, the district court properly considered "the types of insurance purchased by each party as evidence of each party's expectations with respect to its responsibility for a particular loss." Here, the lease did not require Tenants to purchase any specific insurance, much less fire coverage. True, Tenants had purchased $300,000 of liability insurance. But Landlord had insurance coverage of over $19 million, which specifically included fire damage. Given the disparity in the amount of insurance the parties carried, the district court came to a reasonable conclusion: "[t]he

---

[3]    The lease in *RAM* was considerably different. There was a specific "Insurance" heading that clearly provided that "Tenant is responsible for insuring the Premises for liability insurance for the benefit of the Tenant and the Landlord" and that "Tenant will provide proof of such insurance to the Landlord upon the issuance or renewal of such insurance." 820 N.W. 2d at 8. The lease also explicitly stated, "The Tenant is hereby advised and understands that the personal property of the Tenant is not insured by the Landlord for either damage or loss, and the Landlord assumes no liability for any such loss." *Id.*

types of insurance purchased by the parties do not support the conclusion that the parties reasonably expected that [Tenants] would be held responsible for these losses." This analysis is what we required in *RAM*.

Third, once again as required by *RAM*, the district court considered the nature of the premises. As we said in *RAM*, "the fact that the leased premises are part of a large multi-unit structure may be relevant to the equities and the parties' reasonable expectations regarding responsibility." 820 N.W.2d at 16. "[I]n the absence of a 'very clear contractual obligation to the contrary,' the tenant likely is not 'thinking beyond the leased premises' and may not 'as a practical matter . . . be able to afford, or possibly even obtain, sufficient liability insurance to protect against such an extended loss.' " *Id.* The district court reasonably concluded that this factor cut in favor of the Tenants.

Finally, as part of its equitable analysis, and because parties' expectations are shaped by existing law, the district court considered the state of the law at the time that the parties entered into the lease and at the time of the fire. At those times, *Bruggeman*, which barred landlord subrogation claims as a matter of law, was controlling precedent.[4] The district court fairly considered that, when they entered the lease, the parties could not have reasonably expected Tenants would be liable in subrogation.

Once it identified and considered the equitable factors, the district court weighed and balanced them. After doing so, it came to the conclusion that it would not be

---

[4] This equitable issue was not discussed in *RAM*, but *RAM*'s reference to principles of equity and good conscience would seem to allow it to be considered.

equitable to allow State Farm to maintain a subrogation claim through Landlord against Tenants. This was hardly an abuse of discretion.

The opinion of the court does well in limiting this subrogation claim to the damage to Tenants' apartment itself. Certainly this result, in which I concur, is better than that reached by the court of appeals, which devoted little attention to principles of equity. Still, by reversing the district court in part, the court undermines an important principle stated in *RAM*: "The district court is in the best position to 'balance the equities of the case and determine whether the equitable remedy . . . is appropriate.' " 820 N.W.2d at 14 (quoting *Dakota Cty. HRA v. Blackwell*, 602 N.W.2d 243, 244 (Minn. 1999)).

Here, the district court did exactly what *RAM*—and equity—required. Therefore, I respectfully dissent in part.


GILDEA, Chief Justice (concurring in part, dissenting in part).

I join in the concurrence and dissent of Justice Lillehaug.


ANDERSON, Justice (concurring in part, dissenting in part).

I join in the concurrence and dissent of Justice Lillehaug.